# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 24

**OCTOBER TERM, A.D. 2019**

**February 21, 2020**

FOUR B PROPERTIES, LLC, a Delaware limited
liability company and RANCH 10, LLC, a
Wyoming limited liability company,

Appellants
(Plaintiffs),

v.

S-19-0085

THE NATURE CONSERVANCY, a District of
Columbia non-profit corporation,

Appellee
(Defendant).

*Appeal from the District Court of Teton County*
*The Honorable Timothy C. Day, Judge*

***Representing Appellants:***

*Joshua A. Berman, White & Case, LLP, New York, New York; J. N. Murdock, Murdock Law Firm, LLC, Casper, Wyoming; Patrick J. Murphy, Williams, Porter, Day & Neville, P.C., Casper, Wyoming; Timothy J. Pearse, Pearse Law Firm, LLC, Casper, Wyoming. Argument by Mr. Berman and Mr. Murphy.*

***Representing Appellee:***

*Kim D. Cannon, Davis & Cannon, LLP, Sheridan, Wyoming; Leah Schwartz, Ranck & Schwartz, LLC, Jackson, Wyoming. Argument by Mr. Cannon.*

**Before DAVIS, C.J., and FOX, KAUTZ, and GRAY, JJ., and BLUEMEL, D.J.**

**BLUEMEL, D.J., delivers the opinion of the Court; GRAY, J., files a dissenting opinion, in which DAVIS, C.J., joins.**

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BLUEMEL, District Judge.**

[¶1]    The district court entered summary judgment finding a conservation easement unambiguously burdened two parcels of property thereby limiting what the owner can construct on those parcels.  After additional briefing, the district court entered judgment on the pleadings, dismissing claims of breach of contract and breach of implied covenant of good faith and fair dealing.  We affirm.

### ISSUES

[¶2]    The Appellants raised several issues on appeal, which we rephrase as follows:

  1.    Did the district court err when it entered summary judgment in favor of the Conservancy and found the Conservation Easement unambiguous?

  2.    Did the district court err when it entered judgment on the pleadings dismissing Appellants' claims for breach of contract and breach of the covenant of good faith and fair dealing?

  3.    Do the Appellants have a claim of equitable estoppel?

### FACTS

[¶3]    At the heart of this case is a conservation easement governing use on two parcels of land owned by Appellants, Four B Properties, LLC and Ranch 10, LLC.  Appellants sought declaratory relief after the Conservation Easement administrator, The Nature Conservancy (the Conservancy), rejected Appellants' plan to construct a main residence, a guest house, and a caretaker's quarters on each of the two parcels.  Gary Binning, who owns Four B Properties, LLC and Ranch 10, LLC, is a central figure in this case.  Throughout this decision, the Court will occasionally refer to the Appellants as Mr. Binning.

[¶4]    It all began in 1905 when Gladys Moulton's family homesteaded a 500-acre ranch (the Moulton property) on the scenic Snake River floodplain in an area where the Snake River is to the west and Grand Teton National Park is to the east.  The Moulton property has remained largely undeveloped and provides a rich riparian and wildlife habitat for birds of prey, waterfowl, songbirds, native ungulate species, and a diversity of carnivores.

[¶5]    In December 1995, Gladys Moulton, acting as trustee of the Gladys Moulton Trust u/t/a dated as of October 6, 1995, executed and filed with the Teton County Clerk a Warranty Deed and Conservation Easement (1995 Conservation Easement).  That deed conveyed two lots, approximately one acre each, to The Nature Conservancy, a charitable

1

organization, and entrusted to the Conservancy a conservation easement imposed "in perpetuity" "over and across" the entirety of the Moulton property.

[¶6]    The purpose of the 1995 Conservation Easement is the preservation and protection of the property's natural habitat.  That easement specifically states:

> It is the purpose of this Conservation Easement to preserve and protect in perpetuity and to enhance and restore the significant relatively natural habitat and natural ecosystems of Grantor's Land.  Specifically, and without limitation of the general purposes, it is the purpose hereof to preserve, protect, and enhance upon mutual agreement, the natural habitats, including the riparian areas and cottonwood communities on Grantor's Land.  In so doing, it is the purpose of this Conservation Easement to permit the continuation on Grantor's Land of such ranching, residential and recreational uses as are consistent with the conservation purposes of this Conservation Easement.

The 1995 Conservation Easement specifically requires its provisions be "liberally construed to effectuate their purpose of preserving and protecting habitat for wildlife, unique native plants, and meadow and riparian vegetation communities."  Additionally, the 1995 Conservation Easement states that if its terms conflict with any Teton County zoning restrictions, "the more restrictive provisions shall apply."

[¶7]    The 1995 Conservation Easement § 7(J) specifies, "Enforcement of the terms and provisions of this Conservation Easement shall be at the discretion of the Conservancy." Any failure by the Conservancy to enforce a provision within the Conservation Easement is not a waiver.  "Any forbearance on behalf of the Conservancy to exercise its rights hereunder in the event of any breach by Grantor shall not be deemed or construed to be a waiver of the Conservancy's rights hereunder in the event of any subsequent breach."

[¶8]    The 1995 Conservation Easement authorizes several permissible uses and practices. Any owner of property burdened by the Conservation Easement has the right to, among other things, pasture and graze domestic livestock; build, maintain, and repair fencing related to ranching, recreational and residential uses; and utilize the land for passive recreational and guest ranching activities, such as hiking and horseback riding.  In 1995, Section 2(E) of the easement authorized the construction of "no more than (a) four (4) single family residential buildings . . . and (b) two (2) additional single family residential structures of up to 2,000 square feet each, plus minor outbuildings, for employee housing at locations reasonably satisfactory to the Conservancy" on the entire Moulton property. Section 2(E) also permitted "[o]utbuildings such as barns, garages, shops, greenhouses, storage sheds and corrals . . . under (a) above."

2

[¶9]   Upon Gladys Moulton's passing, the Conservancy received the entirety of the Moulton property.  In 2004, the successor trustee to the Gladys Moulton Trust, executed and filed with the Teton County Clerk the First Amendment to Warranty Deed and Conservation Easement (the 2004 Amendment), which amended the 1995 Conservation Easement.  Because the 2004 Amendment amended only a portion of the 1995 Conservation Easement, both must be read together.  The Court will refer to the relevant portions of the easements collectively, as "the Conservation Easement."

[¶10]  The 2004 Amendment divided the Moulton property into four parcels—the Lower Bench Parcel, the Moulton Parcel, the Upper Bench Parcel, and the Remainder Parcel.  The parcels owned by the Appellants, and primary to this case, are the Lower Bench Parcel and the Remainder Parcel—two parcels of approximately 100 acres each.  The Lower Bench Parcel is referred to as Ranch 9, and the Remainder Parcel is referred to as Ranch 10.

[¶11]  The 2004 Amendment deleted § 2(E) of the 1995 Conservation Easement.  Section 2(E) had allowed construction on the Moulton property of no more than four single-family residential buildings and two additional single-family residential structures for employee housing.  The 2004 Amendment replaced § 2(E) with specifications for construction allowed on each of the four parcels.  On the Remainder Parcel, or Ranch 10, the 2004 Amendment § 1(A) authorizes the following:

> To subdivide, transfer and convey the remainder of the Property, and construct, maintain, and replace if destroyed one additional single family residential structure[ ][1] and associated improvements within Building Envelopes not to exceed 10 acres each, the location of which shall be approved by the Conservancy, in its reasonable discretion, subject to all applicable Teton County Regulations.
>
> Associated improvements may include barns, garages, shops, greenhouses, storage sheds and corrals . . . .

The authorization for construction upon the Lower Bench Parcel (Ranch 9) is essentially the same as that for the Remainder Parcel (Ranch 10).  The 2004 Amendment also omits any reference to "outbuildings" replacing that language with the phrase "associated improvements."

[¶12]  In or around 2005, a developer named Mercer Reynolds purchased both Ranch 9 and Ranch 10 for about $19 million from The Nature Conservancy.  Mr. Reynolds and the Conservancy entered into an Agreement for the Purchase and Sale of Real Estate (Purchase

---

[1] The parties agreed that the language regarding the Remainder Parcel in § 1(A) contains a typographical error.  The paragraph should state "residential structure" rather than "structures."

3

and Sale Agreement) for Ranches 9 and 10. Mr. Reynolds assigned his rights under the Agreement for the Purchase and Sale of Real Estate to his company Linger Longer West, LLC, and the Conservancy assigned Ranch 9 and Ranch 10 to Linger Longer West, LLC.

[¶13] The Agreement for the Purchase and Sale of Real Estate had a few amendments. The Third Amendment to the Purchase and Sale Agreement is relevant in this case because the Conservancy agreed to a meaning of "associated improvements" that would allow the construction of a guest house on each of Mr. Reynolds' parcels. The Third Amendment to the Agreement for the Purchase and Sale of Real Estate between Mr. Reynolds and the Conservancy attempted to clarify, but did not amend, the Conservation Easement. It stated as follows:

> The Conservancy hereby confirms to the Buyer that the Conservation Easements permit one (1) residential subdivision of the Property and that each subdivided parcel may contain one (1) ten acre building envelope . . . for a total of two (2) residential parcels with one (1) ten acre building envelope on each parcel. These two (2) residential parcels are referred to as the "Lower Bench Parcel" and the "Remainder Parcel" in the First Amendment. **Further, the Conservancy hereby confirms to the Buyer that the Conversancy construes the Conservation Easements to permit one (1) guest house not exceeding a total of three thousand (3000) square feet in each building envelope as an "associated improvement"** as such term is used on pages 2 and 3 of the First Amendment, provided Buyer obtains authorization under Teton County Land Development Regulations . . . to build a structure of such size. Nothing herein shall be deemed to be an amendment of the Conservation Easements.

(Emphasis added.) The record refers to the Third Amendment to the Purchase and Sale Agreement as the "Mercer PSA".

[¶14] In a September 6, 2006 letter from the Conservancy to Berne Evans, the Conservancy allowed the construction of a guest house and a caretaker's residence on the Moulton Upper Bench Parcel. The letter specifies, "In conversations with your representatives and [The Nature Conservancy] employees and keeping with the customs of Teton County at this time, we agreed that one guest house not to exceed 2500 square feet would be considered an associated improvement." At some point prior to Appellants' purchases of the Lower Bench Parcel and the Remainder Parcel, the Conservancy allowed the owner of the Upper Bench Parcel, which is also burdened by the Conservation Easement, to construct a single-family residential structure, a guesthouse, and a caretaker's quarters.

4

[¶15] In a November 5, 2012 letter to Doug MacKenzie, the Conservancy offered guidance for developing the Moulton parcels. The Conservancy admitted it was "comfortable with up to two kitchens on each of the building envelopes—one for the single family residential structure and one for the guest house (or accessory residential unit by current Teton County regs)." That letter directed the property owner to look to Teton County regulations to define "associated improvements" and the number of residences that could be built on a property. The letter states, as follows:

> While we still have to approve any specific building plan, we have no apriori limitations on the number of other structures in the building envelope or square footage, but rather we would look to county regulations to define these, provided that all the habitable spaces would be considered within the square footage set by the county as reasonable for residential use by a single family. Because the list of "associated improvements" in the easement is not exhaustive, we do look to Teton County regulations for guidance on what is customary in the area historically and today.

The Conservancy emphasized that it looked favorably upon "plans that present significant and lasting ecological enhancement to the property and we would also value a plan that minimizes impact."

[¶16] On December 26, 2012, the United States Bankruptcy Court conveyed, by Special Warranty Deed, the Lower Bench Parcel (Ranch 9) to Appellant Four B Properties, LLC. Four B Properties paid about $7.4 million for the Lower Bench Parcel. The Special Warranty Deed conveyed the property subject to "covenants, conditions, restrictions, reservations, encroachments, rights-of-way and easements of sight and/or record, if any."

[¶17] At the time Four B Properties purchased the Lower Bench Parcel (Ranch 9), Gary Binning had notice that the 1995 Conservation Easement and the 2004 Amendment burdened the Lower Bench Parcel.[2] Mr. Binning admitted in deposition that, before purchasing Ranch 9, he read the Conservation Easement. He also stated that he believed he "could build whatever the [Teton County Land Development Regulations] and the county would allow [him] to build." Mr. Binning testified that nobody made any representations to him about what could be built on Ranch 9 before he purchased Ranch 9. He also admitted he never spoke to anybody at The Nature Conservancy before the

---

[2] In 2000, Henry Phibbs, the successor trustee to the Gladys Moulton Trust, executed and filed with the Teton County Clerk another conservation easement (the 2000 Conservation Easement). About twenty acres of Ranch 9 is governed by the 2000 Conservation Easement. Mr. Binning has not requested approval for the construction of any buildings on property subject to the 2000 Conservation Easement.

5

purchase of Ranch 9. At the time, Mr. Binning planned to build a retirement home on Ranch 9.

[¶18] On December 24, 2012, the United States Bankruptcy Court conveyed, by Special Warranty Deed, the Remainder Parcel (Ranch 10) to G. Douglas Dillard, Jr. and Michele Saba Dillard, Trustees of the Dillard Family Trust dated August 6, 2003. At the time of its conveyance, Ranch 10 was subject to the Conservation Easement and the Conservancy's monitoring activities. The Dillard Family Trust proposed to the Conservancy a plan to construct a main house, caretaker's quarters, and a guesthouse on Ranch 10. The Conservancy rejected the proposed plans by the Dillard Family Trust to build a guesthouse and caretaker's quarters.

[¶19] On May 12, 2017, the Dillards, as trustees of the Dillard Family Trust, conveyed through Warranty Deed the parcel of property commonly referred to as Ranch 10 to Appellant Ranch 10, LLC. In exchange for $6.5 million, Gary Binning, through Four B Properties, received a 50% share of Ranch 10, LLC. At that point, Gary Binning, through Four B Properties, and Doug Dillard, through Slew Grass Capital, LLC, each owned a 50% interest in Ranch 10. On or before October 1, 2018, Mr. Binning paid the balance of $6,900,875 to purchase the remaining 50% membership interest in Ranch 10.

[¶20] Mr. Binning now owns 100% of Ranch 10, LLC. He also owns 100% of Four B Properties, LLC. The Conservation Easement burdens the land owned by both Four B Properties and Ranch 10, LLC.

[¶21] Since purchasing the Lower Bench Parcel (Ranch 9) and the Remainder Parcel (Ranch 10), Mr. Binning has accomplished extensive, and expensive, conservation work. At the cost of about $2 million, Mr. Binning planted and irrigated "hundreds" of cottonwood and spruce trees, and he excavated three ponds on Ranch 9 and a couple of ponds on Ranch 10. He used the gravel tailings from the excavation of the ponds to build roads on his properties. In the newly constructed ponds and streams, he introduced native cutthroat trout stock.

[¶22] In September 2016, James Luchsinger, the Land Strategies Director at the Wyoming Field Office of The Nature Conservancy, sent an email letter to Mr. Binning interpreting the Conservation Easement language. The Conservancy seemed to approve of the construction of a 2,500-square foot guest house when Mr. Luchsinger wrote the following:

> In interpreting what "associated improvements" might be allowed in conjunction with a single family residence, in the past, [the Conservancy] has considered, solely as a point of reference and by no means as a binding determination, the Teton County [Land Development Regulations] relating to a "standard single family residence" in the community.

> Although a guest house is not specifically identified in the Easement as a permitted "associated improvement", [the Conservancy] has previously approved construction of a guest house restricted in size to 2,500 square feet on another portion of the Moulton property known as the Upper Bench Parcel, which is also encumbered by the Easement.
>
> Given the clear language of the Easement intending to restrict the overall number of full time residences on the Property, coupled with past [Conservancy] decisions, the Easement restricts development on each of Ranch 9 and Ranch 10 to one single family residential dwelling, one 2,500 square foot guest house, and other associated improvements as specifically set forth in the Easement's definition of "associated improvements."

When Mr. Binning proposed to construct a main house, caretaker's quarters, and a guest house on Ranch 9, however, the Conservancy rejected the proposed size of the caretaker's quarters and guesthouse.

[¶23] Appellants brought a declaratory judgment action asserting that the Conservation Easement should permit construction of the proposed buildings as "associated improvements." Appellants argued in favor of the Conservancy's historical reliance upon Teton County Land Use Regulations to determine whether to permit construction upon the Moulton property. Additionally, Appellants brought a breach of contract claim that the Conservancy materially breached its obligations. Finally, Appellants brought a claim of breach of implied covenant of good faith and fair dealing asserting that under the alleged contract, the Conservancy engaged in acts that deprived Appellants of the benefit of their agreement.

[¶24] The Conservancy counterclaimed for declaratory relief seeking, among others, a declaration that the Conservation Easement burdens and encumbers Appellants' parcels of property and limits the number of single-family residential structures to one per parcel. The Conservancy also sought a declaration that the phrase "associated improvements" does not include residential structures such as guest houses or caretaker's quarters.

[¶25] The district court granted summary judgment and entered judgment on the pleadings in favor of the Conservancy. Four B Properties and Ranch 10 appealed.

### STANDARD OF REVIEW

[¶26] Summary judgment is proper when the movant demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

7

W.R.C.P. 56(a). "Summary judgment involves a purely legal determination, and accordingly, we undertake *de novo* review of the district court's decision." *Star Valley Ranch Ass'n v. Daley*, 2014 WY 116, ¶ 11, 334 P.3d 1207, 1210 (Wyo. 2014). The Court examines the facts in the record from the vantage point most favorable to the party opposing the motion, "affording to that party the benefit of all favorable inferences that fairly may be drawn from the record." *Parkhurst v. Boykin*, 2004 WY 90, ¶ 13, 94 P.3d 450, 457 (Wyo. 2004). In this case, the district court found the Conservation Easement unambiguous, interpreted it as a matter of law, and entered summary judgment in favor of the Conservancy.

[¶27] After summary judgment, the parties were charged with briefing the remaining breach of contract claim and breach of the covenant of good faith and fair dealing. The Nature Conservancy moved, in part, for judgment on the pleadings. "Our review of a district court's order granting a motion for judgment on the pleadings is de novo." *Matter of Bruce F. Evertson Dynasty Tr.*, 2019 WY 84, ¶ 24, 446 P.3d 705, 711 (Wyo. 2019).

## *DISCUSSION*

[¶28] Central in this case is the meaning and application of the Conservation Easement. A conservation easement is "a nonpossessory interest of a holder in real property imposing limitations or affirmative obligations the purposes of which include retaining or protecting natural, scenic, or open space values of real property, assuring its availability for . . . recreational or open space use, . . . or preserving the . . . cultural aspects of real property." Wyo. Stat. Ann. § 34-1-201(b)(i) (LexisNexis 2019).

> Conservation servitudes . . . are designed to serve primarily public ends. . . . The values promoted are protection of life and health for people, plants, and wildlife. They protect historical and cultural resources as well as natural resources for enjoyment by future generations. . . . The public subsidizes many conservation servitudes by tax deductions when they are created and by allowing reduced property taxes so long as the restrictions remain in force.

Susan F. French, *Perpetual Trusts, Conservation Servitudes, and the Problem of the Future*, 27 Cardozo L. Rev. 2523, 2526–27 (2006). A conservation easement yields not only social benefits but also economic benefits to the property owner and his successors in interest. *Goldmuntz v. Town of Chilmark*, 38 Mass. App. Ct. 696, 698–99, 651 N.E.2d 864, 866 (1995) (holding in-ground swimming pool was not an "accessory structure" within the plain language of conservation easement). It is reasonable that in exchange for the benefit to the property owner, the conservation easement be protected against "expedient exemptions which defeat the purpose of preserving land in its natural state." *Id.* at 699, 651 N.E.2d at 866.

8

[¶29]   At common law, the conservation easement did not fit neatly within "the traditional categories of easement, real covenant, and equitable servitude."  C. Timothy Lindstrom, *Hicks v. Dowd: The End of Perpetuity?*, 8 Wyo. L. Rev. 25, 35 (2008).  There remained a question into which type of property interest the conservation easement fit.  "Uncertainty about the validity of conservation easements at common law prompted a majority of states to pass legislation clarifying the legal status of such easements."  Jon W. Bruce & James W. Ely, Jr., *The Law of Easements & Licenses in Land* § 12:2 (2019).  The National Conference of Commissioners on Uniform State Laws, which drafted the Uniform Conservation Easement Act, deliberately classified the conservation easement as an easement, in part, because "lawyers and courts are most comfortable with easements and easement doctrine" and because "non-possessory interests satisfying the requirements of covenant real or equitable servitude doctrine will invariably meet the Act's less demanding requirements as 'easements.'"   Unif. Conservation Easement Act Refs. & Annos., Prefatory Note.

[¶30]   The Wyoming Uniform Conservation Easement Act §§ 34-1-201 through 207, applies retroactively; therefore, generally speaking, any conservation easement—including the Moulton Conservation Easement—"is now considered an interest in property within that class of interests known as an 'easement,' regardless of the date the conservation easement was created."  Lindstrom, *Hicks v. Dowd: The End of Perpetuity?*, *supra*, 8 Wyo. L. Rev. at 39.  "In Wyoming, a landowner will typically donate a conservation easement to an entity, such as a land trust or governmental organization, and the landowner will simultaneously donate a small parcel of the land in fee to the easement holder."  Michael R. Eitel, *Wyoming's Trepidation Toward Conservation Easement Legislation: A Look at Two Issues Troubling the Wyoming State Legislature*, 4 Wyo. L. Rev. 57, 65 (2004).  Unlike the traditional easement, which allows the holder limited use or enjoyment of the servient owner's land, and unlike the restrictive covenant, which restricts the servient owner's use of his land, the conservation easement imposes a "'negative' burden on the use of land."  Lindstrom, *Hicks v. Dowd: The End of Perpetuity?*, *supra*, 8 Wyo. L. Rev. at 37.  The conservation easement is considered "in gross," which means "[t]here is a servient estate, but no dominant estate."  *Id*.  "The landowner's donation of an appurtenant parcel in fee, in conjunction with recording the conservation restriction, allows the benefit of the easement to run with the land."  Eitel, *Wyoming's Trepidation Toward Conservation Easement Legislation, supra*, 4 Wyo. L. Rev. at 65.

[¶31]   Even though the Conservation Easement held by The Nature Conservancy was last amended in 2004, the Wyoming Uniform Conservation Easement Act governs as long as the conservation easement "would not have been invalid under the pertinent pre-Act . . . case law either because the latter explicitly validated interests of the kind recognized by the Act or, at least, was silent on the issue."  Unif. Conservation Easement Act (1981), § 5, cmt.  This sentiment is codified by Wyo. Stat. Ann. § 34-1-205(b), which states, "This article shall apply to any interest created before its effective date if it would have been

9

enforceable had it been created after the effective date of this article unless retroactive application contravenes the constitution or laws of this state or the United States." In this case, there has been no argument against the validity of the Conservation Easement and no argument against the applicability of the Uniform Conservation Easement Act.

## I. *Interpreting the Conservation Easement*

[¶32] This Court will first review whether the district court erred in granting summary judgment in favor of the Conservancy and in finding the Conservation Easement unambiguous. When the interpretation of a contract is before the Court, the question of whether the contract is ambiguous is a question of law. *Leeks Canyon Ranch, LLC v. Callahan River Ranch, LLC*, 2014 WY 62, ¶ 12, 327 P.3d 732, 737 (Wyo. 2014). "Easements are reviewed under the same principles that have been established for interpretation of contracts." *Davison v. Wyoming Game & Fish Comm'n*, 2010 WY 121, ¶ 9, 238 P.3d 556, 560 (Wyo. 2010) (citations omitted). In keeping with the well-settled rules of contract interpretation, the Court begins its analysis with the easement's plain language. *Claman v. Popp*, 2012 WY 92, ¶ 26, 279 P.3d 1003, 1013 (Wyo. 2012).

[¶33] "Unless the terms of the contract are ambiguous, the language used in the contract expresses and controls the intent of the parties." *State v. Pennzoil Co.*, 752 P.2d 975, 978 (Wyo. 1988). The Court's goal is to determine the drafting parties' intent by closely reading the Conservation Easement and interpreting its language according to its plain and ordinary meaning. *Davison*, ¶ 9, 238 P.3d at 560. "A contract is ambiguous if indefiniteness of expression or double meaning obscure the parties' intent." *Principal Life Ins. Co. v. Summit Well Serv., Inc.*, 2002 WY 172, ¶ 19, 57 P.3d 1257, 1262 (Wyo. 2002). The parties' subsequent disagreement over meaning does not create an ambiguity. *Id.*

[¶34] If the Court determines the Conservation Easement can be understood in only one way, the easement language expresses and controls the drafting parties' intent. *Leeks Canyon Ranch*, ¶ 12, 327 P.3d at 737. If, and only if, the Court cannot determine the plain meaning of the Conservation Easement will the Court find it to be ambiguous. *Claman*, ¶ 29, 279 P.3d at 1013. The Court will not torture words to import ambiguity where the ordinary meaning of the language leaves no room for ambiguity.

[¶35] The Court uses an objective approach and will avoid "interpreting provisions in a way that makes the other provisions inconsistent or meaningless." *Thornock v. PacifiCorp*, 2016 WY 93, ¶ 13, 379 P.3d 175, 180 (Wyo. 2016). "The contract as a whole should be considered, taking into consideration the relationship between the various parts." *Berthel Land & Livestock v. Rockies Exp. Pipeline LLC*, 2012 WY 52, ¶ 13, 275 P.3d 423, 430 (Wyo. 2012). The Court gives the contract language the meaning that the language would have conveyed to a reasonable person at the time and place of its use. *Id.*

[¶36] We begin by determining whether the trial court properly concluded the Conservation Easement is unambiguous. In making this determination, we look to the printed Conservation Easement, itself. The Conservation Easement § 1 sets out its purpose "to preserve, protect, and enhance upon mutual agreement, the natural habitats, including the riparian areas and cottonwood communities on Grantor's Land" while, at the same time, permitting the continuation "of such ranching, residential and recreational uses as are consistent with the conservation purposes of this Conservation Easement." The Conservation Easement § 2 allows the property owner to engage in specific uses and practices, which include, among others, the following:

> A. To pasture and graze domestic livestock; provided . . . that range shall be maintained in a "good" or "excellent" condition [and] that such grazing shall not materially and adversely affect the wintering habitat for elk and mule deer or the other significant relatively natural habitat for plants, wildlife, and similar ecosystems . . . .
>
> * * *
>
> G. To utilize Grantor's Land for passive recreational and guest ranching activities, including but not limited to, hiking, camping, horseback riding, fishing, swimming, picnicking and bird watching, which do not have a material adverse effect on Grantor's Land.

Finally, the Conservation Easement § 5(B) expressly prohibits certain activities including "[t]he construction or placement of any buildings, camping accommodations, mobile homes . . . or any structures, except as permitted herein."

[¶37] The 2004 Amendment of the Conservation Easement, at § 1(A), authorizes the owner to construct upon the Lower Bench Parcel (Ranch 9) one single-family residential structure and associated improvements within a building envelope not to exceed 10 acres. Section 1(A) also authorizes the owner to construct upon the Remainder Parcel (Ranch 10) one single-family residential structure and associated improvements within a building envelope not to exceed 10 acres.

[¶38] The language permitting construction upon the Remainder Parcel (Ranch 10) specifically authorizes the owner to do the following:

> To subdivide, transfer and convey the remainder of the Property, and construct, maintain, and replace if destroyed one additional single family residential structure[ ] and associated improvements within Building Envelopes not to exceed 10

11

acres each, the location of which shall be approved by the Conservancy, in its reasonable discretion, subject to all applicable Teton County Regulations.

Associated improvements may include barns, garages, shops, greenhouses, storage sheds and corrals . . . .

The Conservation Easement § 1(A) includes similar, but not identical, language permitting construction of "one single family residential structure and associated improvements" upon the Lower Bench Parcel (Ranch 9).

[¶39] The § 1(A) provisions allowing the construction of one single-family residential structure and associated improvements cannot be read in more than one way. When its plain language is read so that no other provision is rendered meaningless, § 1(A) does not create an ambiguity. *Davison*, ¶ 9, 238 P.3d at 560. Considering the Conservation Easement's purposes along with the pertinent permitted and prohibited activities, the language is clear that the drafting parties agreed to deliberately limit the number of residential structures. *One* residential structure corresponds to the prohibition against any other construction, except as permitted, while also underscoring the easement's conservation purposes. Mr. Binning is permitted to construct *one* single-family residential structure on each of his parcels.

[¶40] The Conservation Easement is not ambiguous, as its provisions include no double meaning that would obscure the drafting parties' intent. Because it is unambiguous, we can read the plain language of the Conservation Easement using common meanings. "One" is "a single unit or thing." *Merriam-Webster's Collegiate Dictionary* 810 (10th ed. 2000). A "residential structure" is something, such as a building, "that is constructed," for use "as a residence or by residents." *Webster's, supra*, at 993 & 1163. A "residence" is defined as "the act or fact of dwelling in a place for some time" or "the place where one actually lives as distinguished from one's domicile or a place of temporary sojourn." *Webster's, supra*, at 993. This Court has defined a "single family residence" as "a residence constructed for the purpose of serving as a dwelling place for ***one family*** in a single living unit . . . two separate living units is outside of this meaning." *Anderson v. Bommer*, 926 P.2d 959, 963 (Wyo. 1996) (emphases in original). Under the plain meaning of its terms, we conclude, as a matter of law, that "one single-family residential structure" limits construction to a single building in which one family can live and dwell. *See Karaus v. Bank of New York Mellon*, 300 Mich. App. 9, 20, 831 N.W.2d 897, 904 (2012) (holding under the plain language interpretation of construction lien act, "residential structure" is a structure in which the owner actually *intends* to reside).

[¶41] In addition to the "single-family residential structure," Mr. Binning is entitled to construct "associated improvements." "Associated improvements," although not defined by the Conservation Easement, "*may* include barns, garages, shops, greenhouses, storage

12

sheds and corrals." The definition does not limit "associated improvements" to "barns, garages, shops, greenhouses, storage sheds and corrals."

[¶42] Mr. Binning argues that the phrase "associated improvements" is ambiguous because it is open to an indefinite expression that could include guest houses and caretaker's quarters. Mr. Binning claims that the all-inclusiveness of the phrase "[a]ssociated improvements *may include*" indicates that the drafters of the Conservation Easement intended to include guest houses and caretaker's quarters. Mr. Binning points to nothing within the four-corners of the Conservation Easement that would support his argument. We are not swayed that there is an ambiguity raised by Mr. Binning's "subsequent disagreement" over the meaning of "associated improvements."

[¶43] The phrase "associated improvements" contrasts with "residential structure," and nothing in the Conservation Easement suggests those phrases should be read interchangeably. *See, e.g.*, *Bethurem v. Hammett*, 736 P.2d 1128, 1131 (Wyo. 1987) (holding, in a land contract, "merchantable" and "marketable" are synonymous and interchangeable); *State Highway Comm'n v. Black*, 417 P.2d 750, 752 (Wyo. 1966) (holding the terms "appraisal" and "estimate" are synonymous and interchangeable when valuing property). The structures included within "associated improvements" are not structures typically associated with activities that occur on a daily basis within a residential structure. Unless they have a special residential apartment within them, barns, garages, shops, greenhouses, storage sheds, and corrals are not structures in which humans typically perform acts of daily living such as cooking meals, bathing, sleeping, or changing clothing. The plain language shows that "associated improvements" do not include residential structures.

[¶44] If we were to interpret "associated improvements," as Mr. Binning would have us, so that they include structures such as guest houses and caretaker's quarters, it would render meaningless other provisions in the Conservation Easement. Each provision within the Conservation Easement has its purpose, *Claman*, ¶ 28, 279 P.3d at 1013, and no provision can render another provision inconsistent or meaningless, *Thornock*, ¶ 13, 379 P.3d at 180. The Conservation Easement permits *one* single-family residential structure, and § 5(B) explicitly prohibits the construction of any structure, "except as permitted herein." To define "associated improvements" so that they include a second residential structure, such as a guest house or caretaker's quarters, would render meaningless both the allowance for one single-family residential structure and the prohibition against unpermitted structures.

[¶45] The Court rejects any interpretation that results in inconsistent provisions. *Claman*, ¶ 28, 279 P.3d at 1013. Mr. Binning's strained interpretation that employee and guest residential structures are included within the permissive language defining "associated improvements" does not fit within the language allowing *one* single-family residential structure. Interpreting the language of the easement so that no part is rendered meaningless, the Court holds that the phrase "*one* single-family residential structure"

13

would be rendered meaningless if "associated improvements" could also include a second or third residential structure.

## A. Did the Court Incorrectly Apply a Heightened Standard of Strict Interpretation?

[¶46] Mr. Binning claims the district court incorrectly applied a heightened standard of strict interpretation to the Conservation Easement. Since this is a de novo review case, the district court's decision has no bearing on our analysis. This Court's application of contract interpretation principles has brought us to the same conclusion as the district court—that the Conservation Easement is unambiguous, and that the grantor's intent is evidenced by the plain language of the easement.

## B. Did The Nature Conservancy, through its Prior Statements and Decisions, Concede to a Meaning of "Associated Improvements"?

[¶47] Mr. Binning argues that the plain meaning of "associated improvements" becomes clear only upon examination of The Nature Conservancy's previous statements and decisions. He claims that the Conservancy has, essentially, conceded that "associated improvements" include guest houses and caretaker's quarters. He relies upon the Conservancy's past decisions. First, in 2005, the Conservancy agreed to the Mercer PSA where "associated improvements" included one guest house no bigger than 3,000 square feet on the Lower Bench Parcel (Ranch 9) and the Remainder Parcel (Ranch 10). Second, around 2006, the Conservancy permitted the owner of the Upper Bench Parcel, which is also burdened by the Conservation Easement, to construct a single-family residential structure, a guesthouse, and a caretaker's quarters. Third, in November 2012, the Conservancy admitted that up to "two kitchens"—one for the single-family residence and the other for a guest house—could be constructed on each parcel. Then, in a September 2016 email, the Conservancy interpreted "associated improvements" to include a 2,500 square foot guest house.

[¶48] In each of these instances, Mr. Binning is urging this Court to consider evidence outside of the four corners of the Conservation Easement. Mr. Binning has shown that, since the time of the Mercer PSA, The Nature Conservancy has applied definitions of "associated improvements" that differ from the plain language of the Conservation Easement. This Court has held the language of the Conservation Easement is plain and unequivocal. "[T]hat language is controlling." *Hollabaugh v. Kolbet*, 604 P.2d 1359, 1361 (Wyo. 1980). "The parol-evidence rule contemplates that a written instrument that is plain, clear and unambiguous cannot be contradicted, altered, added to, or varied by parol or extrinsic evidence." *Id.* The Conservancy's varying definitions of "associated improvements" cannot be used to contradict the plain language of the Conservation Easement.

[¶49] There is no question that the Conservancy was inconsistent in its interpretation of the Conservation Easement. The Conservation Easement grants the Conservancy discretion in its interpretation and application of the Conservation Easement terms. Section 7(J) of the Conservation Easement specifies, "Enforcement of the terms and provisions of this Conservation Easement shall be at the discretion of the Conservancy." Likewise, under § 7(J), any interpretation by the Conservancy that was contrary to the Conservation Easement's plain language was not to "be deemed or construed to be a waiver of the Conservancy's rights hereunder in the event of any subsequent breach." The Conservancy is not bound by its previous decisions interpreting "associated improvements" to include guest houses or caretaker's quarters.

## C. Did the Change in Language from the 1995 Conservation Easement to the 2004 Amendment Reveal the Drafters' Intent for the Definition of "Associated Improvements"?

[¶50] Mr. Binning draws our attention to Section 2(E) of the 1995 Conservation Easement to demonstrate the drafting parties' intent to include employee housing within the phrase "associated improvements." He claims the 1995 Conservation Easement language allowed for "minor outbuildings, for employee housing." This, he claims, demonstrates that the 2004 Amendment intended to include employee housing as a type of "associated improvement."

[¶51] In actuality, the 1995 Conservation Easement language did not define "minor outbuildings" as "employee housing." Instead, it clearly separated those two terms. Section 2(E) allowed for the construction of two residential structures for employee housing *in addition* to minor outbuildings. The 1995 Conservation Easement § 2(E) specifically allows for the following:

> To construct, maintain and replace no more than (a) four (4) single family residential buildings . . . and (b) *two (2) additional single family residential structures* of up to 2,000 square feet each, plus minor outbuildings, *for employee housing* at locations reasonably satisfactory to the Conservancy.
>
> * * *
>
> Outbuildings such as barns, garages, shops, greenhouses, storage sheds and corrals are also permitted under (a) above.

(Emphasis added.) The 1995 Conservation Easement treated "outbuildings" differently than employee housing, demonstrating that the two phrases were not interchangeable.

15

[¶52] The plain language of the Conservation Easement § 1(A) states that § 2(E) was deleted and replaced. The reference to "employee housing" was removed, and there remains in the Conservation Easement nothing that suggests there was an intent to include "employee housing" within the definition of "associated improvements." The Court will not rely upon the 1995 Conservation Easement § 2(E) to define the phrase "associated improvements."

**D.    Does the Conservation Easement Limit the Number and Size of Proposed Constructions Based Only Upon an Evaluation of Their Impact Upon the Habitat and Natural Ecosystem?**

[¶53] Mr. Binning claims that the definition of the phrase "associated improvements" includes a guest house and caretaker's quarters as long as their construction does not inhibit the environmental preservation purposes set forth in the Conservation Easement. He argues that because the proposed guest houses and caretaker's quarters would not negatively impact riparian areas, cottonwood galleries, or wildlife accessibility and because he has engaged in extensive conservation projects on the properties, the proposed constructions fit within the conservation purposes of the Conservation Easement. Although not stated as such, the argument is that the easement allows Mr. Binning to build whatever structures he wants so long as his construction is within the environmental purposes of the Conservation Easement.

[¶54] As discussed above, the law is that one part of the Conservation Easement cannot render another part meaningless. Each provision of the Conservation Easement has its purpose, and no provision can render another provision inconsistent. *Claman*, ¶ 28, 279 P.3d at 1013; *Thornock*, ¶ 13, 379 P.3d at 180. Mr. Binning must, without question, preserve and protect the delicate riparian area and ungulate habitat; however, he must also adhere to the limitation of construction to one single-family residential structure. Fulfilling the purposes of the Conservation Easement does not grant license to disregard the limitation of one residential structure. Both provisions must, and do, simultaneously regulate the land use on the Lower Bench Parcel (Ranch 9) and the Remainder Parcel (Ranch 10).

[¶55] Mr. Binning claims the Conservation Easement requires preservation and protection of the natural habitats *and* the continuation of ranching and recreational uses. Mr. Binning claims that in order to meet the ranching and recreational use purposes of the Conservation Easement, he must construct a caretaker's cottage on both the Lower Bench Parcel and the Remainder Parcel. He claims that any "modern" ranching operation in Teton County requires the construction of a caretaker's quarters. The Court does not find such strained reasoning persuasive.

16

[¶56] In 2004, when the Conservation Easement was amended, the drafting parties could have foreseen the modern ranching need for a caretaker's cottage. Instead of including such a provision, the drafting parties eliminated any reference to "employee housing" in the 2004 Amendment. The modern Conservation Easement includes no reference to employee housing.

> Where a contract is silent on a particular matter that easily could have been drafted into it, a court should refrain from supplying the missing language under the pretext of contract interpretation. . . . Courts are not at liberty to rescue parties from the consequences of a poorly made bargain or a poorly drafted agreement by rewriting a contract under the guise of construing it.

*In re CDR*, 2015 WY 79, ¶ 30, 351 P.3d 264, 270–71 (Wyo. 2015) (citations omitted). "[S]ilence does not create 'authorization' for an activity that would otherwise be explicitly prohibited." *Nature Conservancy, Inc. v. Sims*, 680 F.3d 672, 677 (6th Cir. 2012) (holding conservation easement that permitted creating ponds was silent as to what should happen with the excavated dirt, but silence did not authorize landowners to use excavated dirt to fill sinkhole on the property).

[¶57] The reference to "employee housing" was removed from the Conservation Easement, and there is no indication that the change was not purposeful. If the drafting parties intended to include employee housing in the 2004 Amendment, it would have been simple to expressly include it. This Court is not at liberty to rewrite the Conservation Easement by including omitted language under the pretext of a "modern" interpretation.

E. **Does the Conservation Easement Limit Proposed Construction Based Only Upon Teton County's Land Development Regulations?**

[¶58] Mr. Binning claims the Conservation Easement limits construction to one residential structure only if he exceeds the requirements of the Teton County Land Development Regulations. Mr. Binning argues the Teton County Land Development Regulations' definition of "accessory residential units" includes dwelling units incidental or subordinate to the primary residence and includes guest houses or caretaker's quarters. Under the Land Development Regulation § 2220(B)(5) (2002), "An accessory residential unit is a dwelling unit which is clearly incidental and subordinate to the primary residential or nonresidential use of the property." Accordingly, Regulation § 2370(B) restricts occupancy of accessory residential units to employees, family members, and guests. Mr. Binning claims that the Teton County definition and regulation of "accessory residential units" should govern the definition of "associated improvements."

17

[¶59] The Conservation Easement does not adopt Teton County Land Development Regulations. The Conservation Easement references Teton County Regulations only twice. First, regarding the Lower Bench Parcel (Ranch 9) and the Remainder Parcel (Ranch 10), the Conservation Easement states the Conservancy shall approve the locations of the building envelopes, "in its reasonable discretion, subject to all applicable Teton County Regulations." The plain language of this provision does not suggest that Teton County Land Development Regulations govern the definition of "associated improvements."

[¶60] Second, regarding interpretation, the Conservation Easement § 7(N) states that any conflict between the Conservation Easement and any Teton County zoning restrictions shall be resolved by the more restrictive provision. There has been no argument or demonstration that there is a conflict in the definition of "associated improvements" and the definition of "accessory residential units." There has been no argument that the Land Development Regulations offered a more restrictive, and therefore, applicable definition of "associated improvements."

[¶61] The Conservation Easement's reference to the Teton County Land Development Regulations does not undermine the Conservation Easement's plain language limitation for construction of one single-family residential structure on each of Mr. Binning's parcels. Zoning regulations cannot override the restrictions placed on the property by the Conservation Easement. *Fox v. Miner*, 467 P.2d 595, 597 (Wyo. 1970) (holding zoning ordinances cannot override, annul, abrogate, or relieve land from restrictive covenants placed thereon). Because the plain language of the Conservation Easement does not include any provision for a guest house or caretaker's quarters within its definition of "associated improvements" and because there has been no demonstration that the Conservation Easement conflicts with or should be controlled by a more restrictive provision from the Land Development Regulations, we hold the Teton County Land Development Regulations do not control the issue of whether the Conservation Easement permits the construction of a guest house or caretaker's quarters on each of Mr. Binning's parcels of property.

**F.     Did the Court Err in Interpreting the Conservation Easements in Contravention of the Doctrine of Free Use of Land?**

[¶62] Mr. Binning claims the district court ignored the policy to construe restrictive covenants in favor of free land use. He cites *Kindler v. Anderson*, 433 P.2d 268, 271 (Wyo. 1967), for the proposition that restrictions on the use of land should be strictly construed in favor of free use of land. "Restrictions upon the use of land, being in derogation of the common law, are not favored, are to be strictly construed, will not be extended by implication, and in case of doubt the restrictions will be construed in favor of the free use of the land." *Id.* The *Kindler* court, immediately thereafter, adds the following caveat, "Nevertheless, if the language imposing the restrictions is clear and unambiguous the rule

18

of strict construction does not apply." *Id.* Where a conservation easement is unambiguous, "[w]e seek to determine and effectuate the intention of the parties, **especially the grantor(s)**, as it may appear or be implied from the instrument itself." *Anderson*, 926 P.2d at 961 (emphasis added).

[¶63] The district court found, and we agree, the Conservation Easement is unambiguous. Because the Conservation Easement is unambiguous, the Court must determine the grantor's intent, as evidenced by the plain language of the Conservation Easement. As this Court held in *Kindler*, the doctrine of strict construction in favor of the free use of land has no applicability where restrictions are imposed upon the land by a clear and unambiguous conservation easement. The district court was correct in entering summary judgment in favor of the Conservancy.

## II.    *Motion for Judgment on the Pleadings*

[¶64] Following the district court's entry of summary judgment in favor of the Conservancy, Mr. Binning's claims for breach of contract and breach of the implied covenant of good faith and fair dealing still had not been addressed. In response to those unaddressed claims, the Conservancy moved for judgment on the pleadings, or, in the alternative, summary judgment. In its *Order on Post-Summary Judgment Motions*, the district court held there had been no breach of contract because the Conservancy had adhered to the terms of the unambiguous Conservation Easement when the Conservancy denied permission for the construction of a guest home or caretaker's quarters on the Lower Bench Parcel and the Remainder Parcel. The court also granted judgment on the pleadings on the claim for breach of the covenant of good faith and fair dealing, as follows:

> The terms of that easement were binding when the property was purchased. Plaintiffs' perception of the benefit of the bargain was based on a misreading or misunderstanding about the limitations imposed in the conservation easement which was contrary to the plain language of the easement documents. The conservation easement has always limited development to one property. Therefore, Plaintiffs could not have been deprived the benefit of the bargain when they were denied the ability to build three houses on their properties. Plaintiffs never had the right under the conservation easement to build three houses on their properties.

Now, Mr. Binning argues that the Mercer PSA, statements made by the Conservancy, and the Conservancy's interpretation of the Conservation Easement on the Upper Bench Parcel represented additional breaches of contract by the Conservancy. Mr. Binning claims the district court failed to consider these additional breaches of contract and incorrectly granted summary judgment to the Conservancy on the breach of contract claim.

19

[¶65] "A defendant is entitled to judgment on the pleadings if the undisputed facts appearing in the pleadings, supplemented by any facts of which the district court may take judicial notice, establish that no relief can be granted." *Greeves v. Rosenbaum*, 965 P.2d 669, 671 (Wyo. 1998). The court treats all the allegations stated in the complaint as true viewing the allegations in a light most favorable to the nonmoving party. *Id.* at 672. The court will grant the motion only if the facts demand that judgment should be entered as a matter of law. *Ecosystem Res., L.C. v. Broadbent Land & Res., L.L.C.*, 2007 WY 87, ¶ 8, 158 P.3d 685, 687–88 (Wyo. 2007).

[¶66] Through the parties' post-summary judgment briefings, the district court was barraged with abstruse arguments that, at best, suggested that Mr. Binning intended to assert a contract claim based upon the Mercer PSA. Mr. Binning never included that claim in the complaint and never moved to amend the complaint to include a set of facts that would allege a second contract claim based upon the Mercer PSA or the Conservancy's previous actions. It was not until the court had entered judgment on the pleadings that Mr. Binning criticized the court for failing to perceive his other breach of contract claims.

[¶67] On the motion for judgment on the pleadings, the district court correctly examined the allegations in the pleadings, alone. W.R.C.P. 12(c). Examining the complaint in a light most favorable to Mr. Binning, the district court would have seen the claim for breach of contract and breach of the implied covenant of good faith and fair dealing based upon the Conservation Easement. The court properly disposed of those claims on summary judgment. The complaint does not include any set of facts alleging the presence of a second contract arising through the Mercer PSA or through any of the Conservancy's previous statements or actions. There is no set of facts in the complaint alleging a breach of implied covenant of good faith and fair dealing based upon the Mercer PSA or upon the Conservancy's previous actions. Because there were no allegations of breach of contract or breach of the covenant of good faith and fair dealing based upon the Mercer PSA or the Conservancy's previous actions, the trial court was correct in entering judgment on the pleadings.

## III. *Equitable Estoppel*

[¶68] Mr. Binning argues he is entitled to the remedy of equitable estoppel because of the way the Conservancy led him to believe he would be entitled to build more than one residential structure on each of his parcels of property. "Equitable estoppel precludes a party who knows the truth from denying the assertion of any material fact with which he induced another to change his position where such other person is ignorant of the facts, had a right to rely upon the assertions, and suffers an injury." *Roth v. First Sec. Bank of Rock Springs, Wyo.*, 684 P.2d 93, 96 (Wyo. 1984). "The elements of equitable estoppel are a lack of knowledge, reliance in good faith, and action or inaction that results in an injury." *Birt v. Wells Fargo Home Mortg., Inc.*, 2003 WY 102, ¶ 34, 75 P.3d 640, 653 (Wyo. 2003).

[¶69]  Mr. Binning neither pled nor argued the equitable estoppel claim in the district court. That argument first appears in the record before this Court.  This Court "strongly adheres" to the rule "that it will not address issues that were not properly raised before the district court."  *Courtenay C. & Lucy Patten Davis Found. v. Colorado State Univ. Research Found.*, 2014 WY 32, ¶ 36, 320 P.3d 1115, 1126 (Wyo. 2014) (citation omitted); *Davis v. City of Cheyenne*, 2004 WY 43, ¶ 26, 88 P.3d 481, 490 (Wyo. 2004).  "We recognize only two exceptions to that rule: when the issue raises jurisdictional questions or it is of such a fundamental nature that it must be considered."  *Davis*, ¶ 26, 88 P.3d at 490.  "[I]t is unfair to reverse a ruling of a trial court for reasons that were not presented to it, whether it be legal theories or issues never formally raised in the pleadings nor argued to the trial court."  *Basic Energy Servs., L.P. v. Petroleum Res. Mgmt., Corp.*, 2015 WY 22, ¶ 28, 343 P.3d 783, 791 (Wyo. 2015) (citations omitted).

[¶70]  "Parties are bound by the theories they advanced below."  *Davis*, ¶ 26, 88 P.3d at 490 (citation omitted).  Wyoming Rule of Civil Procedure 8 requires the Court to liberally construe the complaint to do substantial justice; however, there is nothing in the complaint on equitable estoppel for the Court to construe.  *Basic Energy Servs.*, ¶ 26, 343 P.3d at 791. "[W]e cannot insert averments into a pleading in order to address an issue presented for the first time on appeal."  *Id.*  Mr. Binning will not be permitted to try his case on one theory and appeal it on another.  *Davis*, ¶ 26, 88 P.3d at 490.  Equitable estoppel is not jurisdictional and is not an issue that implicates a fundamental right.  This Court will not address it for the first time on appeal.

### *CONCLUSION*

[¶71]  The district court was correct in entering summary judgment in favor of The Nature Conservancy.  The Conservation Easement is unambiguous, and its language limits the construction upon each of Appellants' parcels of property to one single-family residential structure and associated improvements.  The phrase "associated improvements" is also unambiguous and does not include additional residential structures such as guest houses or caretaker's quarters.  The district court properly entered judgment on the pleadings on Appellants' breach of contract claim and breach of implied covenant of good faith and fair dealing.

**GRAY, Justice,** dissenting, in which **DAVIS, Chief Justice,** joins.

[¶72]  I respectfully dissent.

[¶73]  Reading the Conservation Easement in its entirety, as we must, the phrase "one single family residential structure and associated improvements within a building envelope" does not unambiguously express an intent to restrict the construction of a guest house or employee quarters which conform to the purposes of the Easement.

[¶74]  We review a district court's summary judgment decision de novo. *Questar Expl. & Prod. Co. v. Rocky Mountain Res., LLC*, 2017 WY 10, ¶ 26, 388 P.3d 523, 530 (Wyo. 2017).  The facts are considered from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record.  *Symons v. Heaton*, 2014 WY 4, ¶ 7, 316 P.3d 1171, 1173–74 (Wyo. 2014) (citations omitted).  In cases involving questions of contract interpretation, the following standard of review applies:

> The initial question of whether the contract is capable of being understood in only one way is a question of law for the court.  If the court determines that the contract is capable of being understood in only one way, then the language used in the contract expresses and controls the intent of the parties.  In such case, the next question, what is that understanding or meaning, is also a question of law.  When we review the district court's summary judgment decisions that a contract is capable of being understood in only one way and what that understanding is, we accord no deference to those decisions.

*Union Pac. R.R. Co. v. Caballo Coal Co.*, 2011 WY 24, ¶¶ 12–13, 246 P.3d 867, 871 (Wyo. 2011) (citations omitted).

[¶75]  "Our purpose in interpreting any contract is to ascertain the true intent of the parties." *Sutherland v. Meridian Granite Co.*, 2012 WY 53, ¶ 8, 273 P.3d 1092, 1095 (Wyo. 2012).  The "[i]ntention of the parties is to be determined from the entire context of the instrument, and not from a single clause." *Felix Felicis, LLC v. Riva Ridge Owners Ass'n*, 2016 WY 67, ¶ 18, 375 P.3d 769, 775 (Wyo. 2016) (citations omitted).  "Determination of the parties' intentions requires common sense and good faith; it also requires consideration of the context within which the contract was made." *Davison v. Wyoming Game & Fish Comm'n*, 2010 WY 121, ¶ 9, 238 P.3d 556, 560 (Wyo. 2010) (citation omitted).  However, "[a]ny examination of the context within which the contract was drawn is limited to ascertaining the intent of the parties in making the agreement [and] cannot be invoked to contradict the clear meaning of the language used." *Id.* (citations and internal quotation marks omitted).

22

[¶76]   The purpose of this Conservation Easement is to "preserve and protect [the land] in perpetuity."   More specifically, it is "to preserve, protect, and enhance upon mutual agreement, the natural habitats, including the riparian areas and cottonwood communities on Grantor's Land."   However, "[i]n so doing, it is the purpose of this Conservation Easement to permit the continuation on Grantor's Land of such ranching, residential and recreational uses as are consistent with the conservation purposes of this Conservation Easement."

[¶77]   The opening paragraph of the 1995 Conservation Easement section entitled Grantor's Rights was not affected by the 2004 Amendment.  It states:

> The following uses and practices, though **not an exhaustive recital** of consistent uses and practices, are consistent with this Conservation Easement, and these practices may **not be prevented or limited** by this Conservation Easement except for the requirement of prior approval from the Conservancy where provided herein:

(Emphasis added.)

[¶78]   The consistent uses which may not be prevented or limited in the 1995 Conservation Easement, and which were not affected by the 2004 Amendment include:
    (1) the right to pasture and graze domestic livestock (with certain environmental conditions);
    (2) the right to continue ranching activities to maintain fencing "related to the ranching, recreational and residential uses permitted herein";
    (3) to harvest timber and firewood for "non-commercial, domestic purposes";
    (4) "[t]o utilize [the land] for passive **recreational and guest ranching activities**," which does not include the use of recreational motor vehicles;
    (5) use of minimum agricultural chemicals necessary; and
    (6) to "hunt any game animals" in accordance with applicable law.  (Emphasis added.)

[¶79]   Section 2 (E) of the 1995 Conservation Easement authorized the construction of "no more than (a) four (4) single family residential buildings . . . and (b) two (2) additional single family residential structures of up to 2,000 square feet each, plus minor outbuildings, for employee housing at locations reasonably satisfactory to the Conservancy" on the entire Moulton property.  Section 2 (E) also permitted "[o]utbuildings such as barns, garages, shops, greenhouses, storage sheds and corrals . . . under (a) above."  The 2004 Amendment deleted "Paragraph E of Section 2" and revised the Grantor's building rights in the Lower Bench and Remainder Parcels.  Those building rights now allow the Grantor "to construct, maintain, and replace if destroyed **one single family residential structure and associated**

23

**improvements** within a building envelope." (Emphasis added.) "Associated improvements **may** include barns, garages, shops, greenhouses, storage sheds and corrals." (Emphasis added.)

[¶80] I agree with the majority that the Easement unambiguously prohibits construction of more than "**one single family residential structure**" in the building envelope. I disagree, however, that this phrase unambiguously prohibits a guest house and employee quarters in the same building envelope. We must keep in mind that "the words and acts of the parties must be given effect in accordance with the meaning which they would convey to reasonable men at the time and place of their use or commission." *Klutznick v. Thulin*, 814 P.2d 1267, 1270–71 (Wyo. 1991); *Wangler v. Federer*, 714 P.2d 1209, 1213 (Wyo. 1986). A contract is ambiguous if reasonable persons can read the terms of it in more than one way. *Davison*, ¶ 9, 238 P.3d at 560; *Dwan v. Indian Springs Ranch Homeowners Ass'n, Inc.*, 2008 WY 74, ¶ 9, 186 P.3d 1199, 1202 (Wyo. 2008).

[¶81] The terms of the Conservation Easement are ambiguous. The majority fails to acknowledge that the definitions it applies to "single family residential structure" inextricably contain the purpose of construction within that definition. *See supra* ¶ 40 (A residential structure "is constructed" **for use** "as a residence" and "or by residents" "as distinguished from one's domicile or a place of temporary sojourn." (emphasis added)). Similarly, a "'single family residence' is a residence **constructed for the purpose** of serving as a dwelling place for *one family* in a single living unit." *Anderson v. Bommer*, 926 P.2d 959, 963 (Wyo. 1996) (first emphasis added); *see also Karaus v. Bank of New York Mellon*, 831 N.W.2d 897, 904 (Mich. Ct. App. 2012) (holding under the plain language interpretation of construction lien act, "residential structure" is a structure in which **the owner actually *intends* to reside**). Under these definitions, a reasonable interpretation of the term "single family residential structure" does not include a building constructed for the sole purpose of guest house accommodations or employee quarters. Such buildings would be associated with a "single family residence" and entirely consistent with the stated purpose of the Easement.

[¶82] The buildings proposed by Four B were never intended to "serv[e] as a dwelling place for *one family* in a single living unit." *Anderson*, 926 P.2d at 963. A reasonable person could conclude a structure intended to accommodate guests or to house ranch employees is not a "single family residential structure." *Id.* ("a residence constructed and being used for the purpose of serving as the dwelling place of two separate families or two separate living units is outside of this meaning"); *see also Knadler v. Adams*, 661 P.2d 1052, 1053–54 (Wyo. 1983) (the purpose of a single residential structure "would not be accomplished if the language were interpreted to permit one structure without reference to the occupants").

[¶83]   The majority fails to account for the use of the property as a guest ranch and the explicit reservation of this use in the Conservation Easement.[3]   For emphasis, we again point out "the words and acts of the parties must be given effect in accordance with the meaning which they would convey to reasonable men at the time and place of their use or commission." *Klutznick*, 814 P.2d at 1270.  The provisions in this Conservation Easement could be reasonably construed to differentiate a "single family residential structure" from associated outbuildings which, on a guest ranch, may include guest accommodations and employee quarters.

[¶84]   After concluding a guest house or employee quarters are unambiguously "single family residential structures," the majority then decides that "associated improvements" unambiguously exclude a guest house or employee quarters.  The majority looks to the nonexhaustive list of potential associated improvements and concludes that a guest house or employee quarters do not qualify because the improvements specifically identified "are not structures typically associated with activities that occur on a daily basis within a residential structure." *See supra* ¶ 43.   While true, this reasoning ignores a clearly identified purpose of the Conservation Easement—to "permit the continuation on Grantor's Land of such ranching, residential and recreational uses" which specifically allows the owner to "utilize [the land] for passive recreational and guest ranching activities."   The majority's interpretation is contrary to the directive that "passive **recreational and guest ranching activities**" are not to be limited or prohibited.  A guest house or employee quarters, in the context of a dude ranch, are working structures similar to "barns, garages, shops, greenhouses, storage sheds and corrals."  They are all structures that facilitate "the continuation on Grantor's Land of such ranching, residential and recreational uses as are consistent with the conservation purposes of this Conservation Easement."  They are "associated improvements" in the context of a property used for guest ranching.

[¶85]   The majority also states that if "associated improvements" were interpreted to include structures such as guest houses and caretaker's quarters, it would "render meaningless other provisions in the Conservation Easement." *See supra* ¶ 44.  This relies on the acceptance of the majority's conclusion that these buildings are "single family residential structures."  If, as discussed above, it is reasonable to conclude they are not, then allowing guest houses or caretaker's quarters would be a separate consideration from the "one single family residential structure" requirement and would allow both provisions to be given effect.

---

[3] Wyo. Stat. Ann. § 12-1-101(a)(xxiii) (LexisNexis 2019) states: "'Guest ranch' means a vacation resort offering accommodations for overnight stays and activities typical of western ranching."  These activities normally require employees. *See Beckwith v. Weber*, 2012 WY 62, ¶ 5, 277 P.3d 713, 716 (Wyo. 2012) (the parties "stayed at the ranch and usually rode daily for up to two weeks during their annual visits"); *Halpern v. Wheeldon*, 890 P.2d 562, 563 (Wyo. 1995) ("a ranch employee provided horses for Mr. Halpern and his daughter to ride").

[¶86] The majority reasons the 1995 Conservation Easement § 2(E)'s reference to "outbuildings" and "employee housing" need not be considered because that section was deleted in the Amendment. As a result, it concludes nothing in the amended Conservation Easement suggests an intent to include employee housing within the definition of "associated improvements." *See supra* ¶ 52. In fact, the amended Easement contains clear reference to the provisions in the original. The Recitals to the 2004 Easement state that the Amendment is drafted "**without negatively impacting the intent and purposes of the original [Easement]**." One cannot determine if the Amendment creates a negative impact without considering the original purpose and intent of the Conservation Easement. A shift from allowing a guest house or employee housing to the prohibition of those structures almost certainly results in a negative impact on the continuation of ranching and guest ranching activities on Grantor's Land.

[¶87] "An ambiguous contract is one which is obscure in its meaning because of indefiniteness of expression or because of a double meaning being present." *BNSF Ry. Co. v. Box Creek Mineral Ltd. P'ship*, 2018 WY 67, ¶ 22, 420 P.3d 161, 167 (Wyo. 2018) (citation omitted); *see also Whitney Holding Corp. v. Terry*, 2012 WY 21, ¶ 14, 270 P.3d 662, 666 (Wyo. 2012) ("A term is ambiguous if, considered in light of the plain language of the entire contract, it is susceptible to more than one reasonable meaning." (citation omitted)). Here, we must determine whether a reasonable purchaser of a large acreage with a 10-acre building envelope could interpret the language in the Conservation Easement in only one way—a total prohibition of a guest house and employee quarters. I do not believe that is the only reasonable interpretation of the Conservation Easement.

[¶88] Given the language of the Conservation Easement and potential varying interpretations of that language, I would conclude that the instrument was ambiguous and reverse the summary judgment because a genuine issue of material fact exists as to the intention of the parties. I would remand the case to the trial court to resolve that issue of fact at a trial on the merits.