# IN THE SUPREME COURT, STATE OF WYOMING

## 2017 WY 10

OCTOBER TERM, A.D. 2016

February 1, 2017

QUESTAR EXPLORATION AND PRODUCTION
COMPANY, now known as QEP ENERGY
COMPANY, a Texas corporation; WEXPRO
COMPANY, a Utah corporation;

Appellants
(Defendants),

v.

ROCKY MOUNTAIN RESOURCES, LLC,

Appellee
(Plaintiff).

S-16-0026

*Appeal from the District Court of Sublette County*
*The Honorable Marvin L. Tyler, Judge*

*Representing Appellants:*

>*Shawn T. Welch, Holland & Hart, LLP, Salt Lake City, Utah; Jere C. (Trey) Overdyke, III, and Susan L. Combs, Holland & Hart, LLP, Jackson, Wyoming. Argument by Mr. Welch.*

*Representing Appellee:*

>*Steven F. Freudenthal, Freudenthal & Bonds, PC, Cheyenne, Wyoming; Greg Weisz, Pence and MacMillan, LLC, Laramie, Wyoming; Paul F. Simpson, McGinnis, Lochridge & Kilgore, LLP, Houston, Texas; Patton G. Lochridge and J. Derrick Price, McGinnis, Lochridge & Kilgore, LLP, Austin, Texas. Argument by Mr. Simpson.*

*Representing Wyoming Office of State Lands and Investments, Amicus Curiae in Support of QEP Energy Company:*

> *Peter K. Michael, Attorney General; Ryan T. Schelhaas, Deputy Attorney General; Mackenzie Williams, Senior Assistant Attorney General; Megan L. Nicholas, Senior Assistant Attorney General.*

**Before BURKE, C.J., and HILL, DAVIS, and KAUTZ, JJ., and FENN, D.J.**

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FENN, District Judge.**

[¶1]    Appellants, QEP Energy Company ("QEP") and Wexpro Company ("Wexpro") appeal the district court's decision on cross summary judgment motions, the verdict and final judgment that found them liable for more than thirty million dollars in unpaid royalties, and the district court's denial of their motion for a new trial.  We reverse and remand.

## *ISSUES*

[¶2]    Appellants phrase the issues as follows:

1. Whether the district court erred in concluding as a matter of law that the State of Wyoming's oil and gas lease assignment form contains an anti-washout clause that vested a past state lessee with title to an overriding royalty in a future state lease sold by public auction.

2. Whether the district court erred in concluding as a matter of law that the State of Wyoming did not have to approve an overriding royalty to be valid in a state oil and gas lease even though state approval is required under law.

3. Whether the district court erred in concluding as a matter of law that Wyoming's rule against perpetuities did not bar plaintiff's claim to an overriding royalty interest in a future state oil and gas lease.

4. Whether the district court's Jury Instruction No. 8 improperly instructed the jury without legal or evidentiary support and prejudiced the defense at trial.

5. Whether the district court abused its discretion in denying a motion for a new trial including where the jury verdict determined the causes of action accrued on the date the complaint was filed.

Appellee phrases the issues as follows:

1. Did a 4% overriding royalty interest reserved in assignments of oil and gas leases that extended it to "any renewal lease, substitute lease, or new lease issued in lieu thereof," extend as a matter of law to a subsequent lease covering the same land,

1

issued within weeks after the original leases were surrendered, and promptly acquired by the same working interest owner that surrendered the prior leases?

2. Did the State Land Board have to approve that 4% overriding royalty a second time for it to apply to a subsequent lease under the extension clause in the initial assignment that the Board had already approved?

3. Does a 4% overriding royalty that extends to a future lease under an anti-washout clause violate the Rule against Perpetuities, as a matter of law?

4. Did Jury Instruction No. 8 improperly instruct the jury?
   a. If so, was it an abuse of discretion that prejudiced QEP/Wexpro's statute of frauds defense?
   b. If so, was it an abuse of discretion that prejudiced QEP/Wexpro's bona fide purchaser defense?
   c. If so, was it an abuse of discretion that prejudiced QEP/Wexpro's limitations defense?

5. Were the jury's findings as to when Rocky Mountain Resources and Robert Floyd knew or reasonably should have known that they had a right to sue to enforce the rights to the 4% overriding royalty unsupported by the evidence or contrary to law?

Our resolution of this case makes it unnecessary for us to consider all of the issues presented. We rephrase the issues presented by the parties into a single dispositive issue:

1. Was the Ribbe Lease a "renewal lease, substitute lease, or new lease issued in lieu of" the 505 and 529 Leases?

### *FACTS*

[¶3]   In 1951, the State of Wyoming issued two oil and gas leases covering land in Section 16, Township 32 North, Range 109 West, 6th P.M. ("Section 16") in Sublette County, Wyoming. One of these leases, Lease 0-11505 (the "505 Lease"), covered 160 acres and was issued to Gwen Keif. The other lease, Lease 0-11529 (the "529 Lease"), covered 480 acres and was issued to Walter Davis. Each of these leases had an initial primary term of ten years or as long as oil and gas was produced in paying quantities. The leases also required annual rental payments of $.25 per acre and required drilling to commence within two years unless the State granted a waiver of the drilling obligation.

2

The leases also provided that they could not be assigned without the consent of the State, and any overriding royalty interests had to be approved by the Wyoming State Board of Land Commissioners ("State Land Board") and recorded with the lease.

[¶4]    Gwen Keif assigned the 505 Lease to Walter Davis in 1952.  In 1953, Mr. Davis assigned both the 505 Lease and the 529 Lease to Continental Oil Company ("Continental"), and he reserved a four percent (4%) overriding royalty interest in both leases.[1]  These assignments were made on the State Land Board's standard assignment form, which contained the following language:

> TO HAVE AND TO HOLD unto the said Continental Oil Company, its successors and assigns, subject to the terms and conditions of said lease; the grants and reservations herein contained extending to any renewal lease, substitute lease or new lease issued in lieu thereof with full effect.[2]

[¶5]    On the same day that the State Land Board approved Mr. Davis's assignment of the leases to Continental, it also approved Continental's assignment of the 505 and 529 Leases to Malco Refineries, Inc. ("Malco").[3]

[¶6]    Continental and Malco had previously entered into an agreement to develop oil and gas interests in the Pinedale Area.  Continental, Malco, and El Paso Natural Gas

---

[1] The State Land Board destroyed its records relating to the 505 and 529 Leases long before receiving notice of this suit.  Thus, the parties do not have copies of the assignments to Continental that bear the State Land Board's written notations of the date they were approved or recorded in the State's lease records.  The copies of these assignments that were used in this litigation came from Mr. Davis's personal files.  Copies of these assignments were not recorded in Sublette County until December 27, 2012.

[2] Appellee contends that this language constitutes an anti-washout clause.  An anti-washout clause is intended to prevent conduct by an operator designed to extinguish the overriding royalty interest while at the same time preserving the operator's interest.  *Sawyer v. Guthrie*, 215 F. Supp. 2d 1254, 1258 n.2 (D. Wyo. 2002).  Although these clauses take a variety of forms, their purpose is to extend the burden to a new lease obtained on the same property by the same lessee within a certain period of time.  *Id.* at 1264.  Appellants argue that the language in the State Land Board's assignment form was not an anti-washout clause, especially in light of the fact that there is no "certain period of time" within which the clause applies.  Although the Court agrees that there is a question about whether this language was intended to be an anti-washout clause, given the Court's decision on the application of the contract language to the facts in this case, the resolution of this question is not material to this appeal.  We chose to focus on the meaning of the contract language rather than attempting to determine whether the language fits into the broad, generic "anti-washout clause" label.

[3] These assignments were not recorded in Sublette County and were either lost or destroyed before RMR filed suit.

3

Company ("El Paso") subsequently entered into multiple agreements regarding other oil and gas leaseholds in the Pinedale area.

[¶7]   In 1954, these three companies applied to the United States Geological Survey ("USGS") to approve the formation of the Pinedale Unit.  The State Land Board approved the inclusion of the 505 and 529 Leases in the Pinedale Unit, and Mr. Davis also ratified the formation of the Pinedale Unit.  The Pinedale Unit Agreement provided for the contraction of the unit if the operator failed to commence appropriate activity by January 1, 1975.  Any leases that were outside of a participating area when the contraction occurred would be automatically eliminated from the Pinedale Unit.  The formation of the Pinedale Unit extended the term of the 505 and 529 Leases until the unit terminated or contracted.

[¶8]   As part of the effort to form the Pinedale Unit, El Paso, Malco, and Continental entered into several contracts with Novi Oil Company ("Novi").  These agreements provided that Novi would assign several of its oil and gas leases to El Paso, Malco, and Continental in exchange for five percent (5%) of the net profits from sixty-two (62) oil and gas leases that were to be included in the Pinedale Unit.  These four companies entered into a Unit NPI Contract, which provided that the net profits would be calculated after deducting operating expenses from gross revenue. Gross revenue would be calculated after deducting sums required to pay the overriding royalties that were listed on an exhibit to the agreement.  Mr. Davis was not a party to the Unit NPI Contract, but his previously reserved overriding royalty interests in the 505 and 529 Leases were included in the list of permissible deductions from gross revenue.

[¶9]   In 1955, Malco, Continental, and El Paso all became lessees of the 505 and 529 Leases through various assignments.  These assignments were again approved by the State Land Board.

[¶10]  In 1963, Malco's successor, Hondo Oil and Gas, Continental, and El Paso entered into a Farmout Agreement with Mountain Fuel Supply Company ("Mountain Fuel Supply").  Under this agreement, Mountain Fuel Supply would become a fifty percent (50%) working interest owner in the 505 and 529 Leases by drilling a test well in Section 16.  Mountain Fuel Supply drilled the Pinedale 8 well pursuant to the Farmout Agreement, and it was assigned a fifty percent working interest in the leases.  The assignment to Mountain Fuel Supply was approved by the State Land Board.[4]  As with the seven previous wells that had been drilled in Section 16 by other companies, the Pinedale 8 well confirmed the presence of natural gas in the area, but production was

---

[4] The assignments were not recorded in Sublette County, and Mountain Fuel Supply and the State Land Board destroyed their records of these assignments prior to the suit.

marginal because of the low permeability of the reservoir rock.

[¶11]  Over the next several years, El Paso served as the operator of the Pinedale Unit. In 1974, El Paso obtained government approval to extend the Pinedale Unit's automatic elimination provision to allow further investigation into hydraulic fracturing technology. However, these experiments did not produce enough gas to justify further operations. Although El Paso and other oil and gas companies spent millions of dollars trying to make this area productive, they did not have the technology to access the gas reserves located beneath Section 16.  In 1977, El Paso decided that continued operations in the Pinedale Unit were not economically feasible, and it filed a plan calling for no further activity in that calendar year.  El Paso acknowledged that this action would activate the automatic elimination provision of the Pinedale Unit Agreement, leading to the contraction of the unit.

[¶12]  When the Pinedale Unit contracted, the 505 and 529 Leases were not located in a participating area of the unit.  Thus, when the unit contracted, the 505 and 529 Leases were automatically eliminated from the Pinedale Unit, effective September 12, 1977. Under Wyoming law, those leases were automatically extended for an additional two years.  For the next two years, Mountain Fuel Supply sent various proposals to El Paso to continue development in Section 16.  However, El Paso did not accept any of these proposals, and the 505 and 529 Leases terminated in September 1979.

[¶13]  Pursuant to the State Land Board's regulations that were applicable in 1979, any lands that had previously been subject to an oil and gas lease, which had expired or been terminated for any reason, could only be leased through a public drawing.  This process allowed an applicant to pay a small fee and to have his name placed in the drawing to lease a particular parcel of land.  Each applicant's name could only be placed in the drawing once for each parcel of land.  The successful applicant would then be notified that his name had been drawn, and he would be awarded the lease on that parcel.  These lease drawings attracted thousands of applicants and came to be known as the "Wyoming Lottery."

[¶14]  The October 29, 1979, lease drawing involved sixty-two (62) oil and gas leases for which 26,432 applications to lease were filed.  When the 505 and 529 Leases expired, the State Land Board decided to combine the acreage into a single parcel, offered as Parcel 526 in Drawing No. 46.  There were 1,146 applicants for this parcel.  The drawing was held on November 2, 1979, and Dr. Robert Ribbe was the successful applicant. Dr. Ribbe was a surgeon in Michigan, who had applied for leases on several different parcels of land.  Dr. Ribbe testified that he did so based on the advice of a friend and financial advisor who thought it would be a good investment opportunity.  On November 15, 1979, the State granted Dr. Ribbe lease 79-0645 (the "Ribbe Lease"), which covered all 640 acres of Section 16.  This lease required annual rental payments of $1.00 per acre, and it did not have a mandatory drilling obligation.

5

[¶15] After notifying the successful applicants that they had won the "lottery," the State Land Board would publish a list of the winners. Several oil and gas companies, including Mountain Fuel Supply, had a practice of contacting the winners to see if they could purchase the leases. Soon after Dr. Ribbe was announced as the successful applicant for Parcel 526, Mountain Fuel Supply's subsidiary, Wexpro, contacted Dr. Ribbe, asking if the lease was available for purchase. Dr. Ribbe promptly accepted Wexpro's offer, but the assignment was not actually completed until November of 1980. Due to some pending litigation involving Mountain Fuel Supply and Wexpro, the lease was actually assigned to another subsidiary of Mountain Fuel Supply, Mountain Fuel Resources. Dr. Ribbe received $28,800.00, and he reserved a five percent (5%) production payment, capped at $10,000.00 per acre.

[¶16] On December 4, 1980, the State Land Board approved the assignment of the Ribbe Lease to Mountain Fuel Resources, subject to Dr. Ribbe's five percent (5%) production payment. This assignment was recorded, and it did not disclose any overriding royalty interests. Once the litigation was resolved, Mountain Fuel Supply and Mountain Fuel Resources entered into a Farmout Agreement covering the Ribbe Lease. Pursuant to this agreement, Mountain Fuel Resources would assign all of its operating rights in the Ribbe Lease to Mountain Fuel Supply after Mountain Fuel Supply drilled a well in Section 16.

[¶17] In June 1980, Mountain Fuel Supply applied to the USGS for approval of a new unit, the Mesa Unit. In addition to the Ribbe Lease, the Mesa Unit was going to be comprised of several federal leases, including seven leases in which Walter Davis had owned overriding royalty interests. As part of the formation of the Mesa Unit, Mountain Fuel Supply was required to contact the owners of the oil and gas interests within the unit's boundaries and offer them the opportunity to join the unit. Mountain Fuel Supply sent a letter to Mr. Davis's widow, Robbie Davis, and she signed a ratification and joinder of the Mesa Unit. The USGS approved the Mesa Unit in October 1980, and Mountain Fuel Supply became the operator.

[¶18] In 1983, Mountain Fuel Supply and Mountain Fuel Resources assigned all of their working interests and operating rights in the Ribbe Lease to their affiliate, Celsius Energy Company, which later became QEP. In 1984, Mountain Fuel Supply resigned as operator of the Mesa Unit and designated Wexpro as its replacement. Although QEP and Wexpro have assigned each other various interests in Section 16 over the years, both companies have been lessees and/or working interest owners under the Ribbe Lease since 1984.

[¶19] Throughout most of the 1980s and 1990s there was little production in the Mesa Unit. However, technological advances in the late 1990s finally allowed the Mesa Unit to become productive. By the fall of 2005, hundreds of millions of dollars had been generated from the gas reserves beneath Section 16, and Dr. Ribbe had been paid his capped production payment of $6.4 million. By the time of trial in February 2015, there

were 119 producing wells on the Ribbe Lease.

[¶20] After Mr. Davis's death in 1973, his mineral interests passed to his wife, Mrs. Robbie Davis. When Mrs. Davis passed away, these interests passed to her daughter, Robbie Davis-Floyd. At that time, Mrs. Davis-Floyd was married to Robert Floyd. When they divorced in 2000, the mineral interests were awarded to Mr. Floyd. In 2008, Mr. Floyd contacted a petroleum engineer, Charles Graham, to help review his mineral interests and determine whether he was being paid properly. In 2009, Mr. Graham hired a team to assist him with his investigation. This team became aware of the litigation in *Ultra Resources v. Hartman*, 2010 WY 36, 226 P.3d 889 (Wyo. 2010). They then reviewed the 505 and 529 Leases and formed the opinion that Mr. Davis's four percent (4%) overriding royalty interest should have attached to the Ribbe Lease. In 2011, Mr. Floyd filed suit against QEP and Wexpro asserting that he was entitled to the payment of the overriding royalty. While the suit was pending, Mr. Floyd assigned his mineral interests to his company, Rocky Mountain Resources ("RMR"), and he passed away shortly thereafter.

[¶21] QEP and Wexpro filed a motion for summary judgment. They argued that the language in the 505 and 529 Leases was not an anti-washout clause, and Mr. Davis's overriding royalty interest terminated in 1979 when the leases expired. They also asserted that RMR's claims were barred by the statute of limitations, the statute of frauds, the rule against perpetuities, and laches. QEP and Wexpro also asserted that they were bona fide purchasers who took without notice of RMR's claim, because the assignments had not been recorded before they acquired the Ribbe Lease.

[¶22] RMR filed its own motion for partial summary judgment, asking the district court to rule on the issue of liability while reserving the issue of damages for trial. RMR asked the district court to rule as a matter of law that the 505 and 529 Leases contained an anti-washout clause, which was triggered when Mountain Fuel Supply acquired the Ribbe Lease, and QEP and Wexpro were liable for the payment of the overriding royalty. Both sides submitted voluminous documents in support of their respective motions.

[¶23] The district court ultimately held that the language in the 505 and 529 Leases was an anti-washout provision. It further held that QEP's predecessor had surrendered the 505 and 529 Leases and then acquired the Ribbe Lease covering the same land. The district court went on to find:

> Because the Wyoming Supreme Court determined that [the Ribbe Lease] is a "replacement lease" of [the 505 and 529 Leases], the Court finds and concludes that as a matter of law that pursuant to the Davis Assignments, the reserved 4% ORRI, reserved by Davis in the [505 and 529 Leases],

7

> extended to [the Ribbe Lease] as a "renewal lease, substitute lease or new lease issued in lieu thereof with full effect."

The district court also held that the State Land Board did not need to approve the attachment of the four percent (4%) overriding royalty interest to the Ribbe Lease, because it had initially approved the attachment of the overriding royalty interest to the 505 and 529 Leases.

[¶24] The case proceeded to trial on the issue of damages. The district court instructed the jury that the Ribbe Lease was a replacement lease for the 505 and 529 Leases, and the four percent (4%) overriding royalty interest extended to the Ribbe Lease. QEP and Wexpro objected to this instruction and argued that it prejudiced several of their defenses. The jury ultimately found in favor of RMR, and found QEP liable for $16,734,040.00 and Wexpro liable for $14,146,441.00 for past royalties. The jury also found that QEP and Wexpro are liable for ongoing royalties.

[¶25] This appeal followed. While this appeal was pending, QEP and Wexpro filed a motion for a new trial pursuant to W.R.C.P. 59. The district court denied that motion, and QEP and Wexpro are challenging the denial of that motion as well.

## STANDARD OF REVIEW

[¶26] This Court reviews a district court's summary judgment decision *de novo*. *Fayard v. Design Comm. of the Homestead Subdivision*, 2010 WY 51, ¶ 9, 230 P.3d 299, 302 (Wyo. 2010). Summary judgment is governed by W.R.C.P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Court reviews a summary judgment in the same light as the district court, using the same materials and following the same standards. The record is viewed from the vantage point most favorable to the party who opposed the motion, and this Court will give that party the benefit of all favorable inferences that may fairly be drawn from the record. *Caballo Coal Co. v. Fid. Expl. & Prod. Co.*, 2004 WY 6, ¶ 7, 84 P.3d 311, 313 (Wyo. 2004). An order granting summary judgment can be affirmed on any basis appearing in the record. *Moats v. Prof'l Assistance, LLC*, 2014 WY 6, ¶ 17, 319 P.3d 892, 896 (Wyo. 2014).

[¶27] When summary judgment is entered based on interpretation of a contract, the following standard of review applies:

The initial question of whether the contract is capable of being understood in only one way is a question of law for the court. If the court determines that the contract is capable of being understood in only one way, then the language used in the contract expresses and controls the intent of the parties. In such case, the next question, what is that understanding or meaning, is also a question of law. When we review the district court's summary judgment decisions that a contract is capable of being understood in only one way and what that understanding is, we accord no deference to those decisions.

*Union Pac. R.R. Co. v. Caballo Coal Co.*, 2011 WY 24, ¶ 13, 246 P.3d 867, 871 (Wyo. 2011) (quoting *M & M Auto Outlet v. Hill Inv. Corp.*, 2010 WY 56, ¶ 12, 230 P.3d 1099, 1104 (Wyo. 2010)).

[¶28] "In most appeals from summary judgment, we either affirm the district court or reverse and remand for further proceedings. There are cases, however, in which we reverse and remand with instructions to the district court to enter summary judgment, or partial summary judgment, in favor of the unsuccessful party." *Leithead v. Am. Colloid Co.*, 721 P.2d 1059, 1063–64 (Wyo. 1986); *see also Alexander v. Phillips Oil Co.*, 707 P.2d 1385 (Wyo. 1985).

## *DISCUSSION*

[¶29] Oil and gas contracts and leases are treated under doctrines of contract law. *Moncrief v. Williston Basin Interstate Pipeline Co.*, 880 F. Supp. 1495, 1514 (D. Wyo. 1995). The goal of contract interpretation is to determine the intent of the parties. *Whitney Holding Corp. v. Terry*, 2012 WY 21, ¶ 36, 270 P.3d 662, 673 (Wyo. 2012). If the contract is in writing and its language is clear and unambiguous, intent is determined solely from the contract language. *State v. Pennzoil*, 752 P.2d 975, 978 (Wyo. 1988); *Amoco Prod. Co. v. Stauffer Chemical Co. of Wyo.*, 612 P.2d 463, 465 (Wyo. 1980). The existence of an ambiguity as well as the interpretation and construction of a contract is a matter of law for the Court. *Id.* In giving effect to the contracting parties' intent as expressed in the language of their written contract, a court should abide by the rule that common sense and good faith are the leading characteristics of contract construction. *Wangler v. Federer*, 714 P.2d 1209, 1213 (Wyo. 1986). The language of the parties expressed in their contract must be given effect in accordance with the meaning which that language would convey to reasonable persons at the time and place of its use. *Klutznick v. Thulin*, 814 P.2d 1267, 1270 (Wyo. 1991).

[¶30] The 505 and 529 Leases stated that the grants and reservations granted therein would extend to any "renewal lease, substitute lease or new lease issued in lieu thereof

9

with full effect." RMR asserts that the Ribbe Lease was either a substitute lease or a new lease issued in lieu of the 505 and 529 Leases. These terms are not defined in the assignment form or the regulations promulgated by the State Land Board. Thus, we must accord this language the meaning it would have conveyed to reasonable persons at the time the assignments were made. We must then determine whether the Ribbe Lease falls within the meaning of this provision.

[¶31] Although it is apparent that the district court gave this case careful consideration, it did not engage in an independent analysis of these two phrases. Rather, it concluded that the findings and holdings in the *Hartman* case applied to this case, because the same leases were the subject of both cases. The district court held that, because this Court had determined in *Hartman* that the Ribbe Lease was a "replacement lease" of the 505 and 529 Leases, Mr. Davis's overriding royalty extended to the Ribbe Lease.

[¶32] *Hartman* concerned the interpretation of a net profits contract (Unit NPI Contract) entered into between private parties. It contained very different language than the State Land Board's assignment form. Section 7 of the Unit NPI Contract stated:

> In the event any lease is surrendered or released pursuant to the provisions of this section and thereafter First Parties, or any of them, obtain a lease covering lands the leasehold interest in which has been so surrendered, the interest so acquired or obtained by First Parties, or any of them, shall be subject to the provisions hereof, if such new lease is obtained within five (5) years from the date of any such surrender or release; otherwise, such new lease shall be held by First Parties, or any one of them acquiring such interest, free and clear of the provisions of this agreement and without any obligations whatsoever to Novi.

*Hartman*, ¶ 109, 226 P.3d at 925-26. In *Hartman*, this Court determined that the Ribbe Lease was subject to this provision of the Unit NPI Contract, because it was a new lease covering the same lands that had been subject to the original leases, and it was obtained by an assignee of the First Parties, Mountain Fuel Supply, within five years of the date that the original leases had been surrendered by one of the First Parties, El Paso. This Court stated that the Ribbe Lease was a "replacement lease" of the 505 and 529 Leases. However, the Unit NPI Contract itself does not use that phrase. The Unit NPI Contract states that it applies to any "new lease" covering the same land that was issued within the five-year timeframe.

[¶33] In this case, the district court mistakenly held that the Unit NPI Contract and the language in the State Land Board's assignment form had the same meaning. After analyzing the actual language used in the assignment form and applying it to the

undisputed facts in this case, this Court concludes that the overriding royalty interest did not attach to the Ribbe Lease.

[¶34]  Both parties agree that the 505 and 529 Leases expired in 1979.  At that time, the land subject to those leases reverted to the State.  The State Land Board then decided to combine the acreage into a single lease, and it advertised that parcel for lease through the public drawing system, as was required by the State Land Board's regulations.  The State Land Board received more than a thousand applications to lease this parcel, and Dr. Ribbe was the successful applicant.  The State Land Board then issued a completely new lease to Dr. Ribbe that had substantially different terms than the 505 and 529 Leases; the rental payments increased from $.25 per acre to $1.00 per acre, and the new lease did not contain a mandatory drilling obligation.

[¶35]  Once the lease was issued to Dr. Ribbe, he was free to keep the lease and develop the land himself, or he could sell it to a third party.  Mountain Fuel Supply was the third party who obtained the Ribbe Lease.  However, there is no evidence that Dr. Ribbe was a straw man.  Indeed, it would have been impossible for Mountain Fuel Supply to know which of the applicants would ultimately be granted a lease on the parcel or that the successful applicant would sell the lease to Mountain Fuel Supply instead of selling it to another company.

[¶36]  Unquestionably, the Ribbe Lease was a new lease that covered lands that had been subject to the 505 and 529 Leases, and the lease was ultimately obtained by an assignee of the First Parties to the Unit NPI Contract.  Thus, this Court was correct in determining that the Ribbe Lease was subject to the Unit NPI Contract that was at issue in *Hartman*.  However, that does not necessarily mean that Mr. Davis's overriding royalty interest was extended to the Ribbe Lease.

[¶37]  Under the terms of the State Land Board's assignment form, Mr. Davis's interest only attached to a renewal lease, substitute lease, or new lease issued in lieu of the original leases.  Appellee does not contend that the Ribbe Lease was a renewal lease.  Thus, we need only decide if the Ribbe Lease fits into the other two categories.  The Court must give these phrases the plain, ordinary meaning they would have had at the time the contract was entered into.  Around the time the contract was entered into, "substitute" was defined as: "one who or that which takes the place or serves in lieu of another; one who acts or appears in another's stead."  *New Standard Dictionary of the English Language* 2412 (1941).  "Lieu" was defined as "place; stead." *New Standard Dictionary of the English Language* 1430 (1941).

[¶38]  The undisputed facts show that the Ribbe Lease was not a substitute lease that was intended to take the place of the 505 and 529 Leases, nor was it a new lease issued in the place of the 505 and 529 Leases.  Rather, it was an entirely new lease issued on different terms to an entirely different lessee.  Therefore, Mr. Davis's overriding royalty interest in

the 505 and 529 Leases ended in 1979 when the leases were terminated; it did not attach to the Ribbe Lease, nor was it resurrected when Mountain Fuel Supply subsequently obtained the Ribbe Lease.

[¶39] Because the Ribbe Lease was not a renewal lease, substitute lease, or new lease issued in lieu of the 505 and 529 Leases, the district court erred when it denied QEP and Wexpro's motion for summary judgment and granted RMR's motion. Therefore, we reverse and remand to the district court with instructions to enter summary judgment in favor of QEP and Wexpro.

## *CONCLUSION*

[¶40] The district court erred when it failed to conduct an independent analysis of the language in the State Land Board's assignment form and instead relied on this Court's interpretation of the Unit NPI Contract at issue in *Hartman*. The language in the State Land Board's assignment form extended the overriding royalty interest only to a renewal lease, a substitute lease, or a new lease issued in lieu of the previous lease. The Ribbe Lease did not fall into any of these categories and, therefore, the overriding royalty interest did not attach to the Ribbe Lease. Accordingly, we reverse the district court's grant of summary judgment in favor of Appellee and remand with instructions to enter summary judgment in favor of Appellants.