# IN THE SUPREME COURT, STATE OF WYOMING

# 2022 WY 28

### OCTOBER TERM, A.D. 2021

### February 25, 2022

CHARLENE HASSLER,

Appellant
(Defendant),

v.

S-21-0132

CIRCLE C RESOURCES,

Appellee
(Plaintiff).

*Appeal from the District Court of Natrona County*
The Honorable Kerri M. Johnson, Judge

*Representing Appellant:*
    Jeremy J. Hugus, Platte River Injury Law, Casper, Wyoming.

*Representing Appellee*:
    Timothy M. Stubson and Holly Tysse, Crowley Fleck PLLP, Casper, Wyoming.
    Argument by Ms. Tysse.

*Before FOX, C.J., and DAVIS\*, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

*\*Justice Davis retired from judicial office effective January 16, 2022, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (LexisNexis 2021), he was reassigned to act on this matter on January 18, 2022.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]   Circle C Resources sued its former employee, Charlene Hassler, for breach of a noncompete agreement.  Ms. Hassler claimed the agreement was unenforceable and void as against public policy.  The district court used the blue pencil rule to modify some of the restrictions in the noncompete agreement to make them reasonable (in the district court's opinion), ruled Ms. Hassler had breached the court-modified agreement, and granted summary judgment to Circle C.  We conclude it is no longer tenable for courts to use the blue pencil rule to modify unreasonable noncompete agreements.  Because Circle C's noncompete agreement with Ms. Hassler is unreasonable on its face, it is void in violation of public policy.  We reverse and remand to the district court for entry of summary judgment in favor of Ms. Hassler.

## ISSUE

[¶2]   Ms. Hassler's initial arguments on appeal were primarily that Circle C did not prove her breach of the noncompete agreement was the proximate cause of its damages and the terms of the noncompete agreement were unreasonable, making it void in violation of public policy.  We requested supplemental briefing from the parties on the appropriateness of using the blue pencil rule to revise noncompete agreements.  In light of the arguments raised in that briefing, we conclude the dispositive issue in this case is whether the district court erred by using the blue pencil rule to modify the unreasonable terms in Circle C's noncompete agreement with Ms. Hassler.

## FACTS

[¶3]   Circle C provides day and residential habilitation services to disabled clients in Natrona and Converse counties.  It is also authorized by the Wyoming Department of Health to provide services in Fremont, Weston, Laramie, Johnson, and Campbell counties.  Circle C has a day habilitation facility in Casper where clients interact with each other and participate in activities.  Circle C also engages employees to provide residential habilitation services to clients in the employees' homes.

[¶4]   Circle C hired Ms. Hassler, a CNA, on March 17, 2015, to provide residential habilitation care in her home in Converse County for one of its long-term adult clients (hereinafter referred to as Client).  At the time of her hire, Ms. Hassler signed Circle C's "Confidentiality and Noncompetition Agreement."   The noncompete aspect of the agreement was set out in Section 2.  Paragraph A of that section stated:

>  A.    Employee Conduct with Respect to Competitors.
>  During the term of employee's employment by employer and
>  for 24 months after the end of such employment, employee
>  agrees that employee will not, without the prior written consent

1

of employer, directly or indirectly, whether as an employee, officer, director, independent contractor or service provider, consultant, stockholder, partner, or otherwise, engage in or assist others to engage in or have any interest in any business which competes with employer, or provide services themselves similar to the services provided by employer, or provide such services to any of employer's clients or customers (served by employer at any time during employee's term of employment with employer), in any geographic area in which employer markets or has marketed its services during the year preceding separation from employment. Such geographic area shall include, but not be limited to, the counties of Natrona, Converse, Fremont, Weston, Laramie, Johnson and Campbell in Wyoming, which employer and employee agree is the geographic area that employer presently services. Employee agrees that 24 months is a reasonable term for this agreement given the unique character of employer's business.

Paragraph B prohibited Ms. Hassler from soliciting Circle C's clients for 24 months after their employment relationship ended. Paragraph C stated:

C. Maximum Restrictions of Time, Scope, and Geographic Area Intended. The parties agree and acknowledge that the time, scope and geographic area and other provisions of this agreement have been specifically negotiated by the parties, and employee specifically agrees that such time, scope, and geographic areas, and other provisions are reasonable under these circumstances. Employee further agrees that if, despite the express agreement of the parties to this agreement, a court should hold any portion of this agreement unenforceable for any reason, the maximum restrictions of time, scope, and geographic area reasonable under the circumstances, as determined by the court, will be substituted for the restrictions held unenforceable.

The noncompete agreement also listed remedies available to Circle C for an employee's breach of the agreement.

[¶5]   Circle C trained Ms. Hassler for approximately one month before Client moved into her home. Client was nonverbal and required full-time habilitation care. Ms. Hassler's duties included waking, feeding, toileting, bathing, and dressing Client in the morning, transporting Client to and from Circle C's day habilitation facility in Casper, feeding Client dinner, engaging in activities with Client in the evening, and putting her to bed. Circle C

2

was paid $121,142.10 per year through Medicaid waiver programs for Client's residential habilitation services. Circle C, in turn, paid Ms. Hassler approximately $26,400 per year, resulting in an annual net profit to Circle C of $94,742.10.

[¶6]     Client's mother, who was also her legal guardian, became dissatisfied with Circle C's day habilitation services and decided to find another provider. On January 7, 2017, Client's case manager[1] notified Circle C that Client was changing providers and Ms. Hassler was leaving its employ. Client remained in Ms. Hassler's home for residential habilitation services and transferred to another provider for day rehabilitation. While Ms. Hassler, with assistance from the case manager, worked to obtain her own Medicaid number so she could be a provider, Client's residential habilitation care was billed under another Medicaid provider. Ms. Hassler was paid significantly more by the new provider than she was by Circle C.

[¶7]     On May 31, 2017, Circle C's attorney sent a letter to Ms. Hassler informing her that she was violating the noncompete agreement by soliciting and providing services to Client. Circle C demanded Ms. Hassler "cease and desist" her activities "for at least 12 consecutive months" or it would file suit to enjoin her from violating the agreement and to recover its damages. Although Ms. Hassler received her Medicaid number in July 2017, she responded to Circle C's demand letter by stating she would not "do paid service[]s starting 8-7-17" until the matter was resolved. Ms. Hassler stopped providing paid services to Client until August 2018, but Client continued to live in her home and she occasionally helped with Client's care. Ms. Hassler's husband and daughter cared for Client most of the time and were paid, through Medicaid, for their services.

[¶8]     Circle C filed a complaint against Ms. Hassler in July 2019, seeking damages for breach of the noncompete agreement. Ms. Hassler answered the complaint asserting, among other things, the noncompete agreement was unenforceable and void as against public policy. Both parties moved for summary judgment, and the district court ruled in favor of Circle C. It decided the noncompete agreement was reasonable and enforceable if the geographical area subject to restriction was narrowed to include only Natrona and Converse counties and the duration of the restriction was changed from 24 to 12 months. Applying the blue pencil rule, the district court narrowed the restrictions accordingly. The district court concluded Circle C was damaged in the amount of its projected profit for the modified 12-month term of the agreement and granted judgment in its favor for $94,742.10. Ms. Hassler appealed.

**DISCUSSION**

---

[1] Although it is not entirely clear from the record, it appears the case manager worked with the Medicaid program.

3

[¶9]   Ms. Hassler challenges the district court's summary judgment ruling that her noncompete agreement with Circle C, with modifications to its duration and geographical scope, was consistent with public policy and enforceable.  She claims the district court should have granted judgment in her favor because, as a matter of law, the terms of the noncompete agreement were unreasonable, making it void as against public policy, and it was improper for the district court to revise the agreement to make it reasonable.  Although Ms. Hassler moved for summary judgment in her favor, she did not originally assert unreasonableness of the noncompete agreement's duration and geographical restrictions as a basis for her motion.  She did raise those claims in support of summary judgment in her response to our request for supplemental briefing about the blue pencil rule.

[¶10]  We review a district court's summary judgment order de novo.  *Gowdy v. Cook,* 2020 WY 3, ¶ 21, 455 P.3d 1201, 1206-07 (Wyo. 2020) (citing *Bear Peak Res., LLC v. Peak Powder River Res., LLC,* 2017 WY 124, ¶ 10, 403 P.3d 1033, 1040 (Wyo. 2017), and *Int'l Assoc. of Fire Fighters, Local Union No. 5058 v. Gillette/Wright/Campbell Cnty. Fire Protection Jt. Powers Bd.,* 2018 WY 75, ¶ 19, 421 P.3d 1059, 1064 (Wyo. 2018)).  Interpretation of an unambiguous contract is a question of law subject to de novo review.  *Miller v. Life Care Ctrs. of Am., Inc.,* 2020 WY 155, ¶ 18, 478 P.3d 164, 170 (Wyo. 2020) (citing *Kindred Healthcare Operating, Inc. v. Boyd,* 2017 WY 122, ¶¶ 12-13, 403 P.3d 1014, 1019 (Wyo. 2017)).  Additionally, "[t]he reasonableness, in a given fact situation, of the limitations placed on a former employee by a covenant not to compete are determinations made by the court as a matter of law."  *Hopper v. All Pet Animal Clinic, Inc.,* 861 P.2d 531, 542-43 (Wyo. 1993).

[¶ 11] Summary judgment is generally appropriate when "'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Gowdy*, ¶ 21, 455 P.3d at 1206 (quoting Wyoming Rule of Civil Procedure (W.R.C.P.) 56(a)).  "'In most appeals from summary judgment, we either affirm the district court or reverse and remand for further proceedings.  There are cases, however, in which we reverse and remand with instructions to the district court to enter summary judgment, or partial summary judgment, in favor of the unsuccessful party.'" *Questar Expl. & Prod. Co. v. Rocky Mountain Res., Inc.,* 2017 WY 10, ¶ 28, 388 P.3d 523, 530 (Wyo. 2017) (quoting *Leithead v. Am. Colloid Co.*, 721 P.2d 1059, 1063-64 (Wyo. 1986)).  Given our review of a summary judgment is de novo, W.R.C.P. 56(f)(1)-(2) allows us to grant summary judgment to the nonmovant and "on grounds not raised by the parties" after giving them "notice and a reasonable time to respond."  We gave the parties such notice when we requested supplemental briefing on the issue of whether Wyoming courts should continue to apply the blue pencil rule to cure unreasonable terms in noncompete agreements.

[¶12]  To determine the validity of the noncompete agreement between Circle C and Ms. Hassler, we start with a general discussion of contract law and noncompete agreements. Competent parties have the right to freely contract.  *Nuhome Invs., LLC v. Weller,* 2003

WY 171, ¶ 8, 81 P.3d 940, 944 (Wyo. 2003). *See also, Roussalis v. Wyo. Med. Ctr., Inc.,* 4 P.3d 209, 245 (Wyo. 2000) (recognizing the right of persons to freely enter into contracts). The role of the courts is to interpret contracts consistent with the parties' intent at the time of execution. *P&N Invs., LLC v. Frontier Mall Assocs., LP,* 2017 WY 62, ¶ 10, 395 P.3d 1101, 1104 (Wyo. 2017) (The court's "'ultimate goal when interpreting a contract is to discern the intention of the parties to the document.'" (quoting *Comet Energy Servs., LLC v. Powder River Oil & Gas Ventures, LLC,* 2008 WY 69, ¶ 6, 185 P.3d 1259, 1261 (Wyo. 2008) (other citation and some quotation marks omitted)). Courts generally enforce contracts as written, *James v. Taco John's Int'l, Inc.,* 2018 WY 96, ¶ 12, 425 P.3d 572, 577-78 (Wyo. 2018), and "'are not at liberty to rescue parties from the consequences of a poorly made bargain or a poorly drafted agreement by rewriting a contract under the guise of construing it.'" *Four B Props., LLC v. Nature Conservancy,* 2020 WY 24, ¶ 56, 458 P.3d 832, 846 (Wyo. 2020) (quoting *In re CDR,* 2015 WY 79, ¶ 30, 351 P.3d 264, 270-71 (Wyo. 2015)).

[¶13]   However, contracts contrary to public policy are not "'recognized by the court, and the parties to the contract are left as the court finds them.'" *Retz v. Siebrandt*, 2008 WY 44, ¶ 16, 181 P.3d 84, 90 (Wyo. 2008) (quoting *Tate v. Mountain States Tel. & Tel. Co.*, 647 P.2d 58, 61 (Wyo. 1982)). Instead of revising an agreement to make it consistent with public policy, we typically declare it void. *See, e.g., Century Surety Co. v. Jim Hipner, LLC,* 2016 WY 81, ¶ 20, 377 P.3d 784, 792 (Wyo. 2016) (insurance contract against public policy was "illegal and void" (citation omitted)); *Combs v. Sherry-Combs,* 865 P.2d 50, 54 (Wyo. 1993) (postnuptial agreement providing for a divorce by termination of contract was void as against public policy); *Hede v. Gilstrap,* 2005 WY 24, ¶ 24, 107 P.3d 158, 168 (Wyo. 2005) (agreement giving a biological grandparent visitation rights after the child was adopted violated public policy and was void (citing *Matter of Adoption of RDS,* 787 P.2d 968, 970-71 (Wyo. 1990)).

[¶14]   When considering the enforceability of agreements not to compete, the court must balance competing principles – the public's interest in free competition and trade, the parties' freedom to contract, and the employee's freedom to work. *See Hopper,* 861 P.2d at 539. "[S]ound public policy encourages employees to seek better jobs from other employers or to go into business for themselves." *Ridley v. Krout,* 63 Wyo. 252, 180 P.2d 124, 127 (1947) (citations and quotation marks omitted). Contracts which hinder them from doing so are "'strictly construed and rigidly scanned and are declared void unless necessary for the reasonable protection of the employer.'" *Malave v. W. Wyo. Beverages, Inc.,* 2022 WY 14, ¶ 9, ___ P.3d ____ (Wyo. 2022) (quoting *Brown v. Best Home Health & Hospice, LLC,* 2021 WY 83, ¶ 10, 491 P.3d 1021, 1027 (Wyo. 2021)) (other citation omitted). *See also, Hopper,* 861 P.2d at 539 (the common law policy against contracts that restrain trade is firmly established (citing Restatement (Second) of Contracts §§ 185-188 (1981) (Introductory Note at 35) and *Dutch Maid Bakeries v. Schleicher,* 58 Wyo. 374, 131 P.2d 630, 634 (1942))). Although an employer may use a noncompete agreement to protect itself from improper and unfair competition by a former employee, it "'is not entitled to

protection from ordinary competition.'" *Brown*, ¶ 26, 491 P.3d at 1031 (quoting *Hopper,* 861 P.2d at 539).

[¶15] To be enforceable, a noncompete agreement must be (1) in writing; (2) part of a contract of employment; (3) based on reasonable consideration; (4) reasonable in duration and geographical limitations; and (5) not against public policy. *Hopper,* 861 P.2d at 540. Because a noncompete agreement is a restraint on trade it "'is prima facie invalid,'" as a violation of public policy. *Brown,* ¶ 10, 491 P.3d at 1027 (quoting *Ridley*, 180 P.2d at 128). *See also, DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 681 (Tex. 1990) ("An agreement not to compete is in restraint of trade and . . . unenforceable on grounds of public policy unless it is reasonable."). To overcome the presumption, "'it is incumbent on the [employer] to prove that there existed some special circumstances which rendered [the restraint on trade] reasonably necessary for the protection of the [employer's] business.'" *Brown,* ¶ 10, 491 P.3d at 1027 (quoting *Ridley,* 180 P.2d at 129). *See also, Malave,* ¶ 9, ___ P.3d at ____ (the employer has the burden of overcoming the presumption its noncompete agreement is invalid). In other words, the employer must show the restraint on the employee's employment options is necessary to protect the employer's legitimate business interests. *Brown,* ¶ 26, 491 P.3d at 1030-31 (citing *Hopper,* 861 P.2d at 539, and *Tench v. Weaver,* 374 P.2d 27, 29 (Wyo. 1962)).

[¶16] When courts encounter unenforceable restrictions on trade, they have taken three approaches:

> (1) the "all or nothing" approach, which would void the restrictive covenant entirely if any part is unenforceable, (2) the "blue pencil" approach, which enables the court to enforce the reasonable terms provided the covenant remains grammatically coherent once its unreasonable provisions are excised, and (3) the "partial enforcement" [or liberal blue pencil] approach, which reforms and enforces the restrictive covenant to the extent it is reasonable, unless the "circumstances indicate bad faith or deliberate overreaching" on the part of the employer.

*Skaf,* ¶ 44, 495 P.3d at 902 (quoting *Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.,* 968 F.2d 1463, 1469 (1st Cir. 1992), and *Durapin, Inc. v. Am. Prods., Inc.,* 559 A.2d 1051, 1058 (R.I. 1989)) (emphasis omitted).

[¶17] Prior to *Hopper,* noncompete agreements with unreasonable terms were unenforceable in Wyoming. *Hopper,* 861 P.2d at 545 (citing Restatement of Contracts (First) § 518 (1932); *Tench,* 374 P.2d at 29; *Ridley,* 180 P.2d. at 133; and *Dutch Maid Bakeries*, 131 P.2d at 636). In *Hopper*, we adopted the third approach to unreasonable noncompete agreements. *Hopper*, 861 P.2d at 545-46. Known as the partial enforcement

approach or the liberal blue pencil rule, courts may narrow the terms of noncompete agreements to make them reasonable. *Skaf,* ¶ 44, 495 P.3d at 902 (Wyoming has adopted the partial enforcement approach to allow modification of unreasonable restrictions (citing *Reddy v. Cmty. Health Found. of Man*, 171 W.Va. 368, 298 S.E.2d 906, 915 (1982)); Griffin Toronjo Pivateau, *Putting the Blue Pencil Down: An Argument for Specificity in Noncompete Agreements*, 86 Neb.L.Rev. 672, 682 (2008) [hereinafter Pivateau] (the liberal form of the blue pencil rule permits "a court to rewrite an overbroad non-competition agreement to reasonably limit the restrictions found in the agreement").

[¶18]   Although the liberal blue pencil rule departs from black letter law which prohibits courts from enforcing contracts in violation of public policy or reforming parties' poorly drafted contracts,

> [w]e believe[d] the ability to narrow the term of a covenant not to compete and enforce a reasonable restraint permit[ed] public policy to be served in the most effective manner. Businesses function through the efforts of dedicated employees who provide the services and build the products desired by customers. Both the employer and the employee invest in success by expressing a commitment to one another in the form of a reasonable covenant not to compete. For the employer, this commitment may mean providing the employee with access to trade secrets, customer contacts or special training. These assets of the business are entitled to protection. For the employee, who covenants as part of a bargained for exchange, the covenant provides notice of the limits both parties have accepted in their relationship. The employee benefits during his tenure with the employer by his or her greater importance to the organization as a result of the exposure to the trade secrets, customer contacts or special training. When the employer-employee relationship terminates, a reasonable covenant not to compete then avoids unfair competition by the employee against the former employer and the specter, which no court would enforce, of specific performance of the employment agreement. When the parties agree to terms of a covenant, one of which is too broad, the court is permitted to enforce a narrower term which effectuates these public policy goals without arbitrarily invalidating the entire agreement between the parties and creating an uncertain business environment. In those instances where a truly unreasonable covenant operates as a restraint of trade, it will not be enforced.

*Hopper,* 861 P.2d at 546-47.

[¶19] The jurisprudential doctrine of *stare decisis* generally bids us to follow our precedent.

> We consider the doctrine of *stare decisis* to be an important principle which furthers the "evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process."

> Nevertheless, we should be willing to depart from precedent when it is necessary "to vindicate plain, obvious principles of law and remedy continued injustice." When precedential decisions are no longer workable, or are poorly reasoned, we should not feel compelled to follow precedent. *Stare decisis* is a policy doctrine and should not require automatic conformance to past decisions.

*McCallister v. State ex rel. Dept. of Workforce Servs.,* 2019 WY 47, ¶ 21, 440 P.3d 1078, 1084 (Wyo. 2019) (quoting *State ex rel. Wyo. Workers' Comp. Div. v. Barker,* 978 P.2d 1156, 1161 (Wyo. 1999), and *Goodrich v. Stobbe,* 908 P.2d 416, 420 (Wyo. 1995)).

[¶20]  In light of the doctrine of *stare decisis,* the district court logically followed *Hopper* and reformed the duration and geographical terms of Circle C's noncompete agreement with Ms. Hassler to make the agreement reasonable.  However, we now question whether the legal and policy principles cited in *Hopper* as justification for the liberal blue pencil rule hold true.  Since *Hopper,* we have not used, or affirmed a district court's use of, the liberal blue pencil rule.  In fact, *Skaf* is the only other case where we have discussed the rule in any depth.  There, we reversed the district court's confirmation of an arbitration decision that significantly revised a noncompete agreement between Dr. Skaf and his former medical practice.  *Skaf,* ¶¶ 43, 50, 495 P.3d at 901, 903.  Using the liberal blue pencil rule, the arbitration panel changed two aspects of the scope of Dr. Skaf's medical practice prohibited by the noncompete agreement and the geographical restriction of the agreement.  *Id.*, ¶ 43, 495 P.3d at 901.  We said the liberal blue pencil rule did not "allow the court or arbitrator to rewrite a contract to create a new agreement for the parties in order to uphold a non-compete covenant."  *Id.,* ¶ 44, 495 P.3d at 902.  *See also, Reddy,* 298 S.E.2d at 915 ("No court should trouble itself to rewrite an inherently unreasonable covenant to bring the covenant within the rule of reason.").  Thus, the arbitration panel's decision, which rewrote "three of four restrictions in the covenant resulting in wholesale contract revision," was erroneous.  *Id.,* ¶ 47, 495 P.3d at 903.

[¶21]  Because the arbitration panel's actions in *Skaf* were outside its authority under the liberal blue pencil rule adopted by *Hopper,* we did not need to examine the continued

validity of the rule. However, Justice Davis's special concurrence addressed the wisdom of continuing to allow courts (or other decision makers) to rewrite noncompete agreements to make them reasonable and, thus, enforceable. *Skaf,* ¶¶ 51-58, 495 P.3d at 903-05 (Davis, J., specially concurring). The concurring opinion agreed with the resolution of *Skaf* in light of the narrow standard of review for arbitration awards, but stated that, in an appropriate case, the blue pencil rule should be eliminated. *Skaf,* ¶ 51, 495 P.3d at 903. This is an appropriate case.

[¶22] By allowing a court to reform an agreement that otherwise would be void as a violation of public policy, the liberal blue pencil rule strays from the rational and well established black letter rules of contract interpretation and enforcement discussed above. The blue pencil rule was intended to be a tool to prevent former employees from unfairly competing with employers who had provided them valuable information and training and to promote certainty in the business environment. *Hopper,* 861 P.2d at 546-47. However, in practice, the rule places an unfair burden on employees and creates uncertainty in business relationships.

[¶23] At the time of hire and execution of a noncompete agreement, the scales generally weigh in favor of the employer who holds a superior bargaining position and is the drafter of the noncompete agreement. *Golden Rd. Motor Inn, Inc. v. Islam,* 132 Nev. 476, 376 P.3d 151, 157-58 (2016), *superseded by statute as stated in Paws Up Ranch, LLC v. Martin,* 463 F.Supp.3d 1160, 1164-65 (D. Nev. 2020). *See also, Hopper,* 861 P.2d at 540 (referencing the inequality of bargaining power in employment agreements); *Star Direct, Inc. v. Dal Pra,* 319 Wis.2d 274, 767 N.W.2d 898, 924 (2009) (recognizing employees generally hold a weaker position in the employment bargaining process). The liberal blue pencil rule further tips the scales toward employers by encouraging them to draft noncompete agreements with overly broad and unreasonable trade restraints. *Streiff v. Am. Family Mut. Ins. Co.,* 118 Wis.2d 602, 348 N.W.2d 505, 509 (1984) (the liberal blue pencil rule "tends to encourage employers possessing bargaining power superior to that of the employees to insist upon unreasonable and excessive restrictions, secure in the knowledge that the promise will be upheld in part, if not in full").

[¶24] When challenged, the employer gets the benefit of the court redrafting the agreement to make it reasonable. *Golden Rd. Motor Inn,* 376 P.3d at 158; Pivateau, 86 Neb.L.Rev. at 689-90. The employer receives what "amounts to a free ride on a contractual provision that the employer is . . . aware would never be enforced." Pivateau, 86 Neb.L.Rev. at 689-90. "'[T]his smacks of having one's employee's cake[] and eating it too.'" *Richard P. Rita Pers. Servs. Int'l, Inc. v. Kot*, 229 Ga. 314, 191 S.E.2d 79, 81 (Ga. 1972) (quoting Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 683 (1960) [hereinafter referred to as Blake]). *See also, Reddy*, 298 S.E.2d at 914-15 (in rejecting the liberal blue pencil rule, the West Virginia Supreme Court reasoned it "will necessarily encourage employers to draft overly broad agreements in the belief that . . . if they [are challenged], the terms will simply be judicially narrowed").

9

[¶25]  In this case, Circle C included Paragraph C in the noncompete agreement which specifically contemplated court intervention to redraft the agreement if its terms overstepped the bounds of reasonable trade restrictions.  That is not a proper use of judicial resources or a proper role for judges.  As the Colorado court of appeals stated, "[i]t is not the function of a court to write or rewrite contracts for parties to enable enforcement of a contract that, as written, violates the public policy of the state."  *23 LTD v. Herman,* 457 P.3d 754, 759 (Colo. Ct. App. 2019) (citing *Bayly, Martin & Fay, Inc. v. Pickard*, 780 P.2d 1168, 1175 (Okla. 1989)).

> [T]he court is not a party to the agreement, and the parties have no power or authority to enlist the court as their agent. Thus, parties to an employment or noncompete agreement cannot contractually obligate a court to blue pencil noncompete provisions that it determines are unreasonable.

*Id.  See also, Rector-Phillips-Morse, Inc. v. Vroman,* 253 Ark. 750, 489 S.W.2d 1, 4 (1973) ("We are firmly convinced that parties are not entitled to make an agreement, as these litigants have tried to do, that they will be bound by whatever contract the courts may make for them at some time in the future.").  *But see, Duong v. Fieldsen Hanson Isaacs Miyada Robison Yeh, Ltd.,* 478 P.3d 380, 381 (Nev. 2020) (courts are permitted to "blue pencil" an unreasonable noncompetition agreement if the agreement specifically allows it).

[¶26]  The tendency of employers to draft overly broad covenants "exercise[s] an *in terrorem* effect on employees who respect their contractual obligations and on competitors who fear legal complications if they employ a covenantor," thereby interfering with "the mobility of untold numbers of employees."  Blake, 73 Harv. L. Rev. at 682-83.  *See also, Reddy*, 298 S.E.2d at 914 (employers draft overly broad noncompete "agreements in the belief that most employees will not challenge" them).  An overly broad noncompete agreement dissuades employees from leaving a job for a better opportunity. *Del. Elevator, Inc. v. Williams,* 2011 WL 1005181, *10 (Ch. Ct. Del. 2011).  *See also, Valley Med. Specialists v. Farber,* 194 Ariz. 363, 982 P.2d 1277, 1286 (Ariz. 1999) (en banc) ("For every agreement that makes its way to court, many more do not.  Thus, the words of the covenant have an *in terrorem* effect on departing employees.").  An employee subject to a noncompete agreement "may pass up a competing job offer (or the rival employer might not make the offer in the first place) if the existence of the [agreement] suggests that there is risk of a lawsuit." *Del. Elevator,* 2011 WL 1005181, *10 (citation omitted).  This result is directly contrary to the public policy espoused in our precedent which "'encourages employees to seek better jobs from other employers or to go into business for themselves.'" *Brown,* ¶ 10, 491 P.3d at 1027 (quoting *Ridley,* 180 P.2d at 127).

[¶27]  Furthermore, the liberal blue pencil rule, with its specter of eventual court intervention, means neither employers nor employees can rely, with any assurance, on the

specific terms of the agreements they execute. *See Golden Rd. Motor Inn,* 376 P.3d at 157 (courts' refusal to use the blue pencil to make unreasonable noncompete agreements enforceable "avoids the possibility of trampling the parties' contractual intent"). *See also, Unlimited Opportunity, Inc. v. Waadah,* 290 Neb. 629, 861 N.W.2d 437, 441 (2015) (allowing revision of contracts through the blue pencil rule "creates uncertainty in [employment contracts,] increases the potential for confusion by parties to a contract, and encourages litigation of noncompete clauses in contracts"); Pivateau, 86 Neb.L.Rev. at 691 ("The blue pencil doctrine creates confusion for employees, employers, and the court system. The problem arises out of the fact that it is impossible to predict the construction of a noncompete agreement accurately."). Future litigation may well result in enforcement of a noncompete agreement with terms different from those agreed to by the parties. *See Prod. Action Int'l, Inc. v. Mero,* 277 F.Supp.2d 919, 923-24 (S.D. Ind. 2003) ("'[T]he court may not create a reasonable restriction under the guise of interpretation [of a noncompete agreement], since this would subject the parties to an agreement they had not made.'" (quoting *Young v. Van Zandt,* 449 N.E.2d 300, 304 (Ind. App. 1983)). *See also*, Pivateau, 86 Neb.L.Rev. at 674 ("the blue pencil doctrine . . . creates an agreement that the parties did not actually agree to"). The liberal blue pencil rule, therefore, creates uncertainty in the business environment, undermining the very policy the rule was intended to serve.

[¶28] The doctrine of *stare decisis* does not obligate us to follow precedent that is unjust, clearly contrary to plain and obvious principles of law, or has proven unworkable. *McCallister,* ¶ 21, 440 P.3d at 1084. The liberal blue pencil rule adopted in *Hopper* is contrary to traditional contract law, has worked an injustice on employees, and has contributed to uncertainty in business relationships by encouraging employers to draft overly broad, unreasonable restraints on trade. The law's general distaste for agreements in restraint of trade and assignment to the employer of the duty to show any restraint is reasonable should extend to all terms of the agreement. By rejecting the liberal blue pencil rule, we encourage employers to incorporate only reasonable trade restraints into their employment contracts and to assure such restraints are reasonably tied to legitimate interests requiring protection. Kenneth R. Swift, *Void Agreements, Knocked-Out Terms, and Blue Pencils: Judicial and Legislative Handling of Unreasonable Terms in Noncompete Agreements,* 24 Hofstra Lab. & Emp. L.J. 223, 246 (2007) (rejection of the blue pencil rule encourages careful drafting of restraints to avoid the possibility the entire noncompete agreement will be declared void).

[¶29] We, therefore, overrule *Hopper's* adoption of the liberal blue pencil rule. Returning to our roots, a noncompete agreement which includes unreasonable restrictions on trade violates public policy and is invalid. *Brown*, ¶ 10, 491 P.3d at 1027. The employer has the duty of proving all the terms of the noncompete agreement are reasonable and, therefore, enforceable. Wyoming courts will no longer exceed the scope of their traditional authority in contract interpretation by redrafting noncompete agreements to bring them within the bounds of reason.

[¶30] Under our de novo standard of review, we are permitted to grant summary judgment to the previously unsuccessful party on grounds they did not raise in support of summary judgment after giving the parties proper notice and the opportunity to respond, which we did by requesting supplemental briefing on the continued vitality of the blue pencil rule. *Questar Expl.,* ¶ 28, 388 P.3d at 530; W.R.C.P. 56(f)(1)-(2). There is no dispute that the original terms of the noncompete agreement between Ms. Hassler and Circle C were unreasonable.[2] Circle C did not attempt to justify the geographical restriction which covered many counties outside the area where it actively engaged in its trade. It sought enforcement of the agreement only in Natrona and Converse counties. The district court ruled Circle C had not met its burden of showing the 24-month term of the agreement was reasonable and narrowed it to 12 months. Circle C does not challenge that ruling on appeal. Because there is no dispute that the duration and geographical terms of the noncompete agreement are unreasonable and we no longer permit use of the blue pencil rule to make noncompete agreements reasonable, we conclude the entire agreement is void in violation of public policy. Ms. Hassler is entitled to judgment in her favor.

## CONCLUSION

[¶31] Circle C's noncompete agreement with Ms. Hassler is unreasonable on its face and, therefore, void in violation of public policy. It is untenable to continue to place courts in the position of using the blue pencil rule to draft reasonable terms for the parties. Consequently, it is appropriate to overrule *Hopper's* adoption of the rule.

[¶32] Reversed and remanded for proceedings consistent with this opinion.

---

[2] Given our ruling on the unreasonableness of the duration and geographical terms of the noncompete agreement, we need not determine whether Circle C proved it had a legitimate business interest to protect with the agreement.